**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Auto Club Insurance Association, Auto Club Group Insurance Company, MemberSelect Insurance Company, Fremont Insurance Company, and Meemic Insurance Company,

Plaintiffs,

v.

Adam Berry,

Defendant.

Case No.

Hon.

Mag. Judge

Thomas W. Cranmer (P25252)
Russell J. Bucher (P82349)
Miller, Canfield, Paddock and Stone, P.L.C.
840 W. Long Lake Rd., Suite 150
Troy, MI 48098
(248) 267-3381
cranmer@millercanfield.com
bucher@millercanfield.com

**COMPLAINT**

Plaintiffs, by and through their attorneys, Miller, Canfield, Paddock and Stone, P.L.C., state for their Complaint as follows:

1. This case is about a Michigan attorney, Adam Berry, who has threatened to severely harm Plaintiffs by publicly accusing them of abhorrent discriminatory claims-handling practices unless Berry is paid off. This action seeks redress under federal and Michigan law for Mr. Berry's actions, including the unlawful wiretapping that Mr. Berry committed for the purpose of extorting Plaintiffs.

2. This case does not turn on the truth or falsity of Mr. Berry's threatened accusations, the gist of which is that Plaintiffs intentionally discriminate by race, religion, and ethnicity in their claims handling. And no facts exist to support those malicious accusations; indeed, Plaintiffs do not even collect information about claimants' race, religion, or ethnicity. Plaintiffs nonetheless wish to be crystal clear: they have zero tolerance for discrimination. They do not accept and will not tolerate any invidious discrimination of the kind Mr. Berry has maliciously threatened to accuse them of. Any company representative, at any level, who engages in a racially, religiously, or ethnically discriminatory act, conduct, or practice is subject to immediate termination. Plaintiffs highly value their diverse workforce and customer base, as they do their long-standing relationships with Michigan's diverse communities of all backgrounds. As a matter of principle and as a matter of business, Plaintiffs would never compromise those longstanding relationships and Plaintiffs' own deep-seated commitments to diversity by allowing—let alone engaging in—any racially, religiously, or ethnically discriminatory claims handling.

## PARTIES, JURISDICTION, AND VENUE

3. Auto Club Insurance Association ("ACIA") is a property and casualty insurer authorized by the Michigan Department of Insurance and Financial Services to do business in Michigan. Among other things, ACIA issues automobile insurance

policies under the no-fault act, Mich. Comp. Laws § 500.3101 *et seq.* ("Michigan no-fault policies").

4. ACIA is a Michigan corporation with a principal place of business in Dearborn, Michigan.

5. Auto Club Group Insurance Company ("ACGIC") is a property and casualty insurer authorized by the Michigan Department of Insurance and Financial Services to do business in Michigan. Among other things, ACGIC issues Michigan no-fault policies.

6. ACGIC is a Michigan corporation with a principal place of business in Dearborn, Michigan.

7. MemberSelect Insurance Company ("AAA MemberSelect") is a property and casualty insurer authorized by the Michigan Department of Insurance and Financial Services to do business in Michigan. Among other things, MemberSelect issues Michigan no-fault policies.

8. MemberSelect is a Michigan corporation with a principal place of business in Dearborn, Michigan.

9. Meemic Insurance Company ("Meemic") is a property and casualty insurer authorized by the Michigan Department of Insurance and Financial Services to do business in Michigan. Among other things, Meemic issues Michigan no-fault policies.

10. Meemic is a Michigan corporation with a principal place of business in Auburn Hills, Michigan.

11. Fremont Insurance Company ("Fremont") is a property and casualty insurer authorized by the Michigan Department of Insurance and Financial Services to do business in Michigan. Among other things, Fremont issues Michigan no-fault policies.

12. Fremont is a Michigan corporation with a principal place of business in Fremont, Michigan.

13. Although ACIA, ACGIC, MemberSelect, Meemic, and Fremont are under common ownership and therefore are affiliates of each other, Meemic and Fremont each have their own claims department.

14. ACIA, ACGIC, and MemberSelect all do business using the "AAA" brand, but Meemic and Fremont do not.

15. Defendant Adam Berry is a Michigan-licensed attorney who practices with The Law Offices of Berry and Berry, PLLC, a law firm headquartered and with its principal place of business in Dearborn, Michigan. Defendant is domiciled in the State of Michigan.

16. Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 and § 1367, because this action arises under the laws of the United States and

because this Court has supplemental jurisdiction over all claims in this action that do not arise under the Constitution, laws, or treaties of the United States.

17. Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant resides in the Eastern District of Michigan and because a substantial part of the events giving rise to the claims occurred in the Eastern District of Michigan.

**BACKGROUND: THE RELEVANT ACTORS**

18. In 2024, Ms. W[1] was an insurance claims specialist who adjusted certain first-party and third-party automobile insurance claims for ACIA, ACGIC, and MemberSelect.

19. Ms. W has never been employed by or served as an agent in any capacity for Meemic or Fremont.

20. The only automobile insurance claims that Ms. W adjusted for ACIA, ACGIC, and MemberSelect were first-party and third-party claims under Michigan no-fault policies for benefits arising out of bodily injuries sustained in auto-related accidents (collectively, "injury claims"). However, Ms. W never adjusted any claims for benefits under Personal Protection Insurance (more commonly known as "Personal Injury Protection," or "PIP").

[1] Plaintiffs refer to this individual psuedonymously to protect her personal privacy and to protect her against retaliation or harassment. Defendant and his attorneys are aware of Ms. W's identity, including her full name.

21. In 2024, Ms. W was one of dozens of claims specialists who adjusted injury claims for ACIA, ACGIC, and MemberSelect.

22. Part of Ms. W's responsibilities when adjusting injury claims for MemberSelect was to conduct conversations by telephone with individuals with injury claims against MemberSelect, or with attorneys for such individuals.

23. MemberSelect treats such calls between claims specialists and injured claimants (or their attorneys) as private, does not divulge their contents to anyone not affiliated with the company, and securely stores and protects information acquired in the course of such conversations.

24. Claims specialists for MemberSelect are not to conduct such calls where the conversation may be overheard by anyone not affiliated with the company, such as a family member of a claims specialist who is working remotely from his or her residence.

25. Among other reasons for the privacy of those calls are that they involve discussing highly confidential medical information and other protected personal information, and because those conversations also regularly involve claims-settlement discussions.

26. Hani Azakir is a Michigan-licensed attorney with Berri Azakir PLLC, a law firm in Dearborn, Michigan.

27. On information and belief based on Mr. Azakir's representations, Mr. Azakir is a friend of Defendant Adam Berry, and Mr. Azakir's law office is located in the same building as Mr. Berry's.

28. On information and belief based on Defendant Berry's own representations and his status as a partner/principal of The Law Offices of Berry and Berry, PLLC, at all times relevant to this Complaint Mr. Berry has not entered into any paid attorney-client relationships in his individual capacity but instead solely in his capacity as an agent of The Law Offices of Berry and Berry, PLLC.

29. On information and belief based on Mr. Berry's own representations, at all times relevant to this Complaint all of Mr. Berry's clients involving automobile insurance claims against any of the Plaintiffs have been third-party litigation funders ("TPLFs," sometimes also called third-party legal funders), not injured individuals (or providers of medical services or equipment).

30. Robert Akouri is a Michigan-licensed attorney with Akouri & Associates, PLLC, a law firm in Livonia, Michigan.

## THE RELEVANT EVENTS

31. In approximately September 2024, Mr. Azakir was speaking by telephone with Ms. W to attempt to resolve a third-party injury claim that one of Mr. Azakir's clients had against MemberSelect (the "First Call").

32. Apparently, Ms. W's chatty, agreeable manner and de-escalating style of speaking led Mr. Azakir to come away from his discussion with Ms. W during the First Call believing that Ms. W was willing to make certain comments or agree with certain opinions expressed by Mr. Azakir regarding how "AAA" negotiates and pays out injury claims.

33. Shortly after the First Call ended, Mr. Azakir encountered Defendant Berry in a common space of the building where they both work.

34. On information and belief based on Mr. Azakir's own later representations, Mr. Azakir told Mr. Berry during their encounter that Ms. W had made certain assertions or voiced certain opinions indicating that "AAA" engages in discriminatory practices in its claims handling as to race, religion, and ethnicity.

35. On information and belief, based on what Mr. Azakir said to Mr. Berry about the First Call, Mr. Berry's subsequent actions, and Mr. Berry's familiarity with Michigan's automobile insurance industry, Mr. Berry believed that Ms. W's purported statements would be extremely harmful to the reputation and business goodwill of Plaintiffs if those statements became public and that Plaintiffs would pay a large sum of money to prevent any such statements from becoming public.

36. Mr. Berry devised a scheme whereby Mr. Azakir would arrange a call with Ms. W about the same injury claim, entrap Ms. W and elicit statements from her that would be damaging to Plaintiffs' reputation and business goodwill if released

to the public, and secretly record the call for Mr. Berry without Ms. W's or MemberSelect's knowledge or consent.

37. Accordingly, Mr. Berry asked Mr. Azakir to call Ms. W back; to try to elicit statements from her similar to what Mr. Azakir had told Mr. Berry that Ms. W purportedly had made during the First Call; and to record that follow-up call for Mr. Berry.

38. Mr. Berry's primary purpose in soliciting Mr. Azakir to record the follow-up call with Ms. W was to use the contents of the recording against Plaintiffs, including by extorting Plaintiffs by threatening to divulge the recording or its contents.

39. Mr. Azakir agreed to Mr. Berry's request that Mr. Azakir call Ms. W back about the same claim they had discussed during the First Call, try to entrap Ms. W and elicit certain damaging statements from her, and record the conversation for Mr. Berry.

40. Accordingly, approximately one week after the First Call, Mr. Azakir called Ms. W back about the same claim they discussed during the First Call, and attempted to entrap Ms. W and elicit damaging statements from her about Plaintiffs' claims-handling practices (the "Second Call").

41. Acting as Mr. Berry's agent, Mr. Azakir recorded some or all of the Second Call via audiovisual means and provided Mr. Berry with a copy of the recording.

42. At no time did Mr. Azakir or Mr. Berry either request Ms. W's or MemberSelect's consent to record the Second Call or inform Ms. W or MemberSelect that the Second Call was being recorded.

43. If Mr. Azakir (or Mr. Berry) had asked Ms. W for consent to record the Second Call, she would have denied consent, said that such recording was not allowed, and not continued with the Second Call unless he committed not to record it.

44. On information and belief, the device used to record the Second Call was a smartphone.

45. On information and belief, the device used to record the Second Call was separate from the device on which Mr. Azakir was conducting the Second Call with Ms. W.

46. On information and belief based on Mr. Berry's status as a licensed attorney, Mr. Berry knew that directly threatening Plaintiffs that he would publish or otherwise divulge contents of the Second Call unless Plaintiffs paid him not to do so could subject Mr. Berry to civil and criminal liability—including but not limited to

for extortion and illegal eavesdropping or wiretapping—as well as attorney disciplinary proceedings for violating the Michigan Rules of Professional Conduct.

47. Accordingly, Mr. Berry, alone or in concert with Mr. Akouri, devised a further scheme to draft a complaint against Plaintiffs that would recount the purported statements that Ms. W had made during the First Call and the Second Call, to send that complaint and a copy of the recording of the Second Call to Plaintiffs, and to threaten to file the complaint in the Michigan state courts unless Plaintiffs paid Mr. Berry not to do so.

48. As part of that scheme, Mr. Berry, alone or in concert with Mr. Akouri, also determined to demand multiple "facilitation" sessions with Plaintiffs, to bring home the true nature of Mr. Berry's threats while attempting to shield him from liability for extortion and to shield from use or disclosure in court the contents of Mr. Berry's communications with Plaintiffs going forward.

49. On January 4, 2026, Mr. Akouri, acting as Mr. Berry's attorney and agent, sent an email message to Michael Kramer, who was at the time an attorney representing Plaintiffs in various litigation matters.

50. Attached to that email message was a recording of part of the Second Call, a transcription of a purported examination under oath of Mr. Azakir taken by Mr. Akouri regarding the purported circumstances and contents of the First Call and

the Second Call, and a Microsoft Word document titled "Berry Complaint DRAFT" (hereafter, the "Sham Complaint").

51. The recording attached to Mr. Akouri's January 4, 2026 email to Mr. Kramer does not capture the entire Second Call.

52. Either parts of the original recording of the Second Call were intentionally deleted before sending it to Mr. Kramer or the original recording was intentionally limited so as not to capture the entire Second Call.

53. The intended effect of that modification of the original recording, or only partial recording of the Second Call, was to obscure that Ms. W's statements during the Second Call were made in the course of claims-negotiation discussions and to obscure that those discussions also involved the exchange of protected medical and personal information.

54. In the body of Mr. Akouri's January 4, 2026 email message on behalf of Defendant Berry, Mr. Akouri demanded immediate "facilitation" and stated "**Should we fail to facilitate and resolve by February 1, 2026 I have been instructed to file my complaint.**" (Emphasis original.)

55. Mr. Akouri's January 4, 2026 email on behalf of Defendant Berry was intended as, and intended to be understood as, a threat to publish or otherwise divulge the contents of the Second Call recording.

56. The Sham Complaint attached to Mr. Akouri's email was a ruse.

57. Among other reasons, that is because the Sham Complaint was objectively frivolous.

58. The sole plaintiff named in the Sham Complaint was Mr. Berry in his individual capacity.

59. Broadly speaking, the Sham Complaint alleged that "Automobile Club Insurance Association (AAA)" engaged in discriminatory practices in its claims handling as to race, religion, and ethnicity.

60. The Sham Complaint recounted purported statements that Ms. W had made during the First Call and the Second Call, and confirmed that Mr. Azakir had recorded the Second Call at the direction of Mr. Berry.

61. The Sham Complaint alleged that as a result of the alleged discriminatory claims-handling practices, Mr. Berry's "clients received substantially reduced settlements or were wrongfully denied benefits entirely," and that because Mr. Berry represents clients on a contingency-fee basis, Mr. Berry's fee income had therefore been reduced by millions of dollars.

62. The Sham Complaint further alleged that as a result of the alleged discriminatory claims-handling practices, Mr. Berry was "forced" to "file lawsuits and pursue litigation on claims that should have been paid on a pre-litigation basis, requiring [Mr. Berry] to incur substantial additional costs including filing fees, court costs, expert witness fees, and increased staffing expenses."

63. The Sham Complaint alleged federal and Michigan causes of action, including for violation of 42 U.S.C. § 1981 and the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 et seq.

64. No competent attorney would reasonably believe that Mr. Berry had standing or a cause of action against Plaintiffs for discriminatory claims-handling practices, let alone that Mr. Berry had either standing or a cause of action to sue in his individual capacity for the discriminatory claims-handling practices that were alleged in the Sham Complaint.

65. Indeed, Plaintiffs pointed out these basic legal deficiencies (among many others) to Mr. Berry and Mr. Akouri, but neither ever had any meaningful response.

66. Mr. Berry's intent to extort Plaintiffs became even clearer as time passed.

67. Among other things, Mr. Berry made a "settlement" demand to Plaintiffs of $40,000,000, a number which bore no reasonable relationship whatsoever to anything pleaded in the Sham Complaint.

68. Mr. Berry stated that if Plaintiffs paid the "settlement" demand amount, he would destroy his copies of the Second Call recording and not divulge its contents.

69. Mr. Berry's intent to extort all five Plaintiffs was made clear when Mr. Akouri sent Plaintiffs a list of all insurance "claims" for which Mr. Berry was alleging he was entitled to "damages" pursuant to the Sham Complaint, which included claims under Michigan no-fault policies issued by ACIA, ACGIC, MemberSelect, Meemic, and Fremont.

70. On September 10, 2026, Mr. Akouri was on a call with Plaintiffs' attorneys to discuss the possibility of another "facilitation."

71. Unexpectedly, Mr. Berry joined the call after it had already gotten underway, and he began speaking directly to Plaintiffs' attorneys.

72. Among other things, Mr. Berry told Plaintiffs' attorneys that Plaintiffs should "look deeper" at his claim. But in terms of looking "deeper," Mr. Berry said nothing about the merits of anything in the Sham Complaint. Instead, he immediately proceeded to say that Plaintiffs were a $6 billion company with $2 billion in cash reserves and that "It's not like I'm asking for one billion dollars." Mr. Berry then stated that if the recording of the Second Call were to go public, Plaintiffs would spend well over $100 million in legal fees defending against other lawsuits.

*        *        *

## CAUSES OF ACTION

## COUNT I

### VIOLATION OF THE FEDERAL WIRETAP ACT
### 18 U.S.C. §§ 2511, 2520
### (Plaintiff MemberSelect Insurance Company against Defendant Adam Berry)

73. Plaintiffs restate and reincorporate all of the preceding allegations as if fully restated here.

74. Title III of the Omnibus Crime Control and Safe Streets Act of 1968, see Pub. L. No. 90-351, tit. III, 82 Stat. 197, 211–25, commonly known as the Federal Wiretap Act, proscribes intentionally intercepting or procuring another person to intercept any wire or electronic communication, as well as disclosing or using the contents of an unlawfully intercepted wire or electronic communication. 18 U.S.C. § 2511(1)(a), (c), (d).

75. The Federal Wiretap Act provides MemberSelect with a civil cause of action against Defendant Berry for Berry's intentional interception, disclosure, and use of the Second Call. 18 U.S.C. § 2520(a).

76. The Second Call was a wire or electronic communication as set forth at 18 U.S.C. § 2510.

77. Defendant Berry intentionally intercepted or procured another person to intercept the Second Call.

78. Defendant Berry's intentional interception or procuring of another person to intercept the Second Call was directed at MemberSelect and the other Plaintiffs.

79. Defendant Berry intentionally intercepted or procured another person to intercept the Second Call without the prior consent of Ms. W or MemberSelect.

80. Defendant Berry intentionally intercepted or procured another person to intercept the contents of the Second Call for the purpose of committing one or more of the following criminal or tortious acts in violation of the laws of the United States and of the State of Michigan:

> • Use or divulging of information that Defendant Berry knew or reasonably should have known was obtained in violation of Mich. Comp. Laws § 750.539c, Michigan's eavesdropping statute. Mich. Comp. Laws § 750.539e.
>
> • Interference with commerce by extortion, in violation of United States law. 18 U.S.C. § 1951.
>
> • Transmission of a communication in interstate commerce containing a threat to injure the reputation of a corporation, in violation of United States law. 18 U.S.C. § 875(d).
>
> • Blackmail/extortion for violation of the civil rights laws of the United States, including 42 U.S.C. § 1981, in violation of United States law. 18 U.S.C. § 873.
>
> • Extortion in violation of Michigan law. Mich. Comp. Laws § 750.213.

81. Defendant Berry has intentionally disclosed and endeavored to disclose the contents of the Second Call to others, including but not limited to for the purpose of extorting MemberSelect and the other Plaintiffs, knowing or having reason to

know that the information was obtained through the interception of a wire or electronic communication in violation of 18 U.S.C. § 2511.

82. Defendant Berry has intentionally used and endeavored to use the contents of the Second Call, including but not limited to for the purpose of extorting MemberSelect and the other Plaintiffs, knowing or having reason to know that the information was obtained through the interception of a wire or electronic communication in violation of 18 U.S.C. § 2511.

83. As a direct and proximate result of Defendant Berry's violations of 18 U.S.C. § 2511, MemberSelect has been injured and is entitled to relief pursuant to 18 U.S.C. § 2520, including: (a) such preliminary and other equitable or declaratory relief as may be appropriate, including preliminary and permanent injunctive relief (i) precluding Defendant Berry from using or disclosing the contents of the Second Call and (ii) requiring Defendant Berry to permanently destroy all copies of the Second Call within Defendant Berry's possession, custody, or control; (b) the greater of MemberSelect's actual damages or statutory damages of at least $10,000; (c) punitive damages in an amount to be determined; and (d) reasonable attorney fees and other litigation costs reasonably incurred.

## COUNT II

## VIOLATION OF MICHIGAN'S EAVESDROPPING STATUTE
**Mich. Comp. Laws §§ 750.539c, 750.539e**
**(Plaintiff MemberSelect Insurance Company against Defendant Adam Berry)**

84. Plaintiffs restate and reincorporate all of the preceding allegations as if fully restated here.

85. The Michigan Penal Code, 1931 Mich. Pub. Act 328, proscribes the wilful use of any device to eavesdrop upon a private conversation without the consent of all parties thereto, as well as knowingly aiding, employing, or procuring another person to do so. Mich. Comp. Laws § 750.539c. Eavesdropping includes recording or transmission. Mich. Comp. Laws § 750.539a(2).

86. Although Michigan is a "one-party" state that generally does not proscribe the recording of a conversation by one participant without the knowledge or consent of all participants, one participant's sole consent is insufficient to make permissible the eavesdropping of a third party.

87. The Michigan Penal Code also proscribes using or divulging any information known or that reasonably should be known to have been obtained through illegal eavesdropping. Mich. Comp. Laws § 750.539e.

88. The Michigan Penal Code expressly provides MemberSelect, as a party to the Second Call through its agent Ms. W, with a civil cause of action and civil

remedies against Defendant Berry for his eavesdropping on the Second Call and his use and divulging of the information so obtained. Mich. Comp. Laws § 750.539h.

89. Michigan common law also provides MemberSelect with a civil cause of action for damages against Defendant Berry for his violations of Mich. Comp. Laws §§ 750.539c and 750.539e.

90. Defendant Berry wilfully used a device to eavesdrop upon the Second Call without the consent of Ms. W or MemberSelect, or knowingly employed or procured Hani Azakir to do so.

91. The Second Call was a private conversation between MemberSelect, through its agent Ms. W, and Hani Azakir, and MemberSelect and Ms. W intended and reasonably expected the Second Call would be free from intrusion or surveillance.

92. Defendant Berry has used and divulged information from the Second Call that he knew or reasonably should have known was obtained through eavesdropping proscribed by Mich. Comp. Laws § 750.539c.

93. As a direct and proximate result of Defendant Berry's violations of Mich. Comp. Laws §§ 750.539c and 750.539e, MemberSelect has been injured and is entitled to relief pursuant to Mich. Comp. Laws § 750.539h and Michigan common law, including for actual damages as well as punitive damages in an amount to be determined by the court or by a jury.

## COUNT III

### EXTORTION AND ATTEMPTED EXTORTION
### Mich. Comp. Laws §§ 750.213, 750.92
### (All Plaintiffs against Defendant Adam Berry)

94. Plaintiffs restate and reincorporate all of the preceding allegations as if fully restated here.

95. The Michigan Penal Code, 1931 Mich. Pub. Act 328, proscribes maliciously threatening, orally or in writing, either (a) to accuse another of any crime or offense or (b) to injure the person or property of another with intent thereby to extort money or pecuniary advantage or with intent to compel the person threatened to do or refrain from doing any act against his will. Mich. Comp. Laws § 750.213.

96. The Michigan Penal Code also proscribes attempting to commit a crime prohibited by law where in such attempt any act has been done towards the commission of such offense. Mich. Comp. Laws § 750.92.

97. Michigan common law provides Plaintiffs with a civil cause of action for damages against Defendant Berry for his violation of Mich. Comp. Laws § 750.213 and his violation of Mich. Comp. Laws § 750.92 in attempting to violate Mich. Comp. Laws § 750.213.

98. Defendant Berry has, both on his own and through his agent Robert Akouri, maliciously threatened to accuse Plaintiffs of violating United States law and Michigan law prohibiting discrimination by race, religion, or ethnicity, and has

maliciously threatened to injure Plaintiffs, their reputation, and their business goodwill, with intent thereby to extort money from Plaintiffs and to compel Plaintiffs to pay money to Mr. Berry against Plaintiffs' will.

99. As a direct and proximate result of Defendant Berry's violations of Mich. Comp. Laws §§ 750.213 and 750.92, Plaintiffs have been injured and are entitled to relief for their actual damages, including the costs incurred in preparing for a possible release by Mr. Berry of his recording of the Second Call and in attempting to persuade Mr. Berry to cease his extortion of Plaintiffs, as well as punitive damages in an amount to be determined by the court or by a jury.

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in their favor and against Defendant Adam Berry in an amount to be determined for their actual and statutory damages, plus punitive damages, interest, costs, and attorney fees incurred in this matter; grant preliminary and permanent injunctive relief in Plaintiffs' favor (i) precluding Defendant from using or disclosing the contents of the Second Call and (ii) requiring Defendant to cause to be permanently destroyed all copies of any recording of the Second Call within Defendant's control and all copies of any other information obtained as a result of any recording of the Second Call; and grant Plaintiffs such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Thomas W. Cranmer

Thomas W. Cranmer (P25252)
Russell J. Bucher (P82349)
840 W. Long Lake Rd., Suite 150
Troy, MI 48098
(248) 267-3381
cranmer@millercanfield.com
bucher@millercanfield.com
*Attorneys for Plaintiffs*

Dated: October 15, 2026