# EXHIBIT 5

# **Declaration of Ryan D. Bohannon**

In accordance with 28 U.S.C. § 1746, Ryan D. Bohannon declares as follows:

1. I am an attorney licensed in Michigan and a partner with Kienbaum Hardy Viviano Pelton & Forrest, P.L.C. I have personal knowledge of the facts stated in this Declaration, except where I state them on information and belief or to the best of my knowledge. If called as a witness, I could testify to them under oath.

2. On January 5, 2026, The Auto Club Group (and its affiliated insurers, including Plaintiffs—referred to collectively throughout my declaration as the "Auto Club") asked me and my firm to represent it in responding to pre-suit demands that Defendant Adam Berry made through his counsel, Robert Akouri of Akouri & Associates, PLLC.

3. This Declaration describes my communications with Mr. Akouri and Mr. Berry, and documents those individuals sent to me. It does not describe any communication between me and my client or any work product or mental impressions of me and my firm. The Auto Club does not waive, and I do not intend to waive, the attorney-client and work-product privileges.

4. Mr. Berry's claim, as his counsel presented it, is that the Auto Club and its affiliated insurers systematically discriminate against Arab American, Muslim, and African American claimants in handling automobile injury claims. However, instead of making a demand on behalf of such claimants, it was asserted that this conduct reduced the settlements paid on cases Mr. Berry handled and that Mr. Berry is therefore owed

the additional contingency fees he would have earned on larger settlements. Mr. Akouri's January 4, 2026 email to the Auto Club's then-counsel, Michael Kramer, attached a draft complaint, a partial recording of a 2024 call between attorney Hani Azakir and an Auto Club claims specialist, and a statement under oath of Mr. Azakir.

5. On January 9, 2026, I spoke to Mr. Akouri for the first time. I told him that Mr. Berry's claims were, to put it charitably, novel, and I asked him for the evidence on which Mr. Berry based them: the specific claim numbers, claimant names, time periods, any other evidence of claims mishandling, and the comparative analysis that the draft complaint alleged Mr. Berry had conducted. I confirmed that request in writing the same day. (Tab 1.)

6. Mr. Akouri offered little discussion of how he intended to prove his client's claims and no evidence. He turned almost immediately to the Auto Club's supposed need to keep the recording confidential, warning that otherwise it would face his client's lawsuit. He told me that he did not represent Mr. Azakir, but that Mr. Azakir would need to join any resolution so that complete confidentiality could be secured. The conversation did not focus on how Mr. Berry would prove improper conduct; the focus was on what Mr. Berry's side could offer in exchange for payment.

7. Throughout my discussions with Mr. Akouri, I made clear that the Auto Club would investigate and if evidence showed the Auto Club had mishandled any claim, for any reason, the Auto Club would remediate it. Mr. Akouri constantly deflected discussion of evidence and instead, demanded "facilitation." (Tabs 2, 3.) I told

him that the Auto Club would not pay for confidentiality, or for the destruction of a recording he characterized as damaging, and that mediation would be worthwhile only if he presented actual evidence of mishandled claims and a developed basis for his allegations. Eventually two mediations were held, during which no evidence of discriminatory claims handling was presented.

8. I requested such evidence repeatedly, in writing. I asked for it on January 9, January 20, March 2, March 9, March 23, and April 1. (Tabs 1, 2.) In response, Mr. Berry only produced four spreadsheets with over 1,500 claims dating back more than a decade, representing that these were all the Black, Arab, or Muslim claimants he represented and who were discriminated against—but he produced no evidence to support discriminatory claims handling whatsoever. (Tabs 2, 4.) Mr. Akouri later admitted that Mr. Berry did not even directly represent the claimants listed on the spreadsheets. (Tab 5.) Instead, he represented a fund that had purchased the claims from medical providers who had treated the claimants. (*Id.*)

9. I asked for any evidence of wrongdoing again on May 12, May 13, and May 18. (Tab 6.) In response, Mr. Akouri admitted that Mr. Berry selectively chose the claims shown on the four spreadsheets, which he asserted involved "blanket denials" against Black or Arab claimants, while admitting Mr. Berry had in his possession and control other claims that he managed for a fund where Black or Arab claimants were not issued "blanket denials" by the Auto Club and where white claimants were issued "blanket denials." (*Id.*)

10. Mr. Akouri advised that my repeated insistence on evidence was infuriating Mr. Berry, that the mediator had to intervene and hold a conference call with Mr. Berry to calm him down, and that if the Auto Club did not stop demanding evidence, Mr. Berry would make the recording public by moving forward with litigation.

11. Despite repeated requests, and eventually demands, neither Mr. Akouri nor Mr. Berry produced any evidence to support Mr. Berry's conclusory allegations. Instead, the discussion inevitably turned to their threat to disclose, by way of a public complaint, a recording that Mr. Berry's draft complaint and Mr. Azakir's sworn statement established was made surreptitiously, at Mr. Berry's suggestion, without the Auto Club's claims specialist's knowledge. They repeatedly threatened that the complaint, if filed, would embarrass the Auto Club and, as Mr. Akouri and Mr. Berry repeatedly put it, trigger copycat claims from other personal injury attorneys, nationwide class actions, and loss of business from the Arab and Black communities that the Auto Club serves.

12. Mr. Berry made that threat explicit on September 10, 2026, during a video conference. Mr. Berry joined the call after it started and spoke directly to me and other counsel for the Auto Club. He said he was frustrated by the adjournments and by the absence of a counteroffer, and asked that we convey to the Auto Club that it should "look deeper" at his claim. By "looking deeper," he said nothing about evidence of wrongdoing and little about his claims. Instead, Mr. Berry conveyed that "looking deeper" meant focusing on the Auto Club's annual revenue, ability to pay, and the

damage that would come with public disclosure of the recording. Mr. Berry said the Auto Club has "$6 billion in annual revenues" with "$2 billion in cash reserves"; that "it's not like I'm asking for $1 billion"; and that if the recording went public, the Auto Club would spend well over "$100 million" defending other lawsuits and nationwide class actions. He concluded by saying even if he could only show "$1 in damage," paying his demand would cost the Auto Club less than the damage that would follow if the recording became public. He said he would give the Auto Club until October 16, 2026, but no longer, to make an offer, and said it would be "the last delay"—meaning he would release the recording unless the Auto Club agreed by October 16 to pay him.

13. Throughout these discussions, I identified the deficiencies in the draft complaint, including but not limited to Mr. Berry's lack of standing to assert claims of discrimination against people who were not his clients, the absence of any supporting evidence, and the fact that the Auto Club's review had found no evidence of improper claims handling. (Tabs 2, 3.)

14. Mr. Akouri, acting as Mr. Berry's counsel, nevertheless persisted in making extraordinary monetary demands in return for a promise to destroy the recording and keep the allegations confidential. For instance, on April 17, 2026, Mr. Berry demanded $40,000,000.00 double the "approximately 20,000,000.00 in claims" Mr. Akouri had attributed to all of Mr. Berry's clients combined. (Tab 3.) He later made clear that he would only negotiate in the tens of millions of dollars.

15. Throughout, Mr. Akouri and Mr. Berry offered, unprompted, that in exchange for payment the recording would be destroyed, the matter kept confidential, and the attorneys involved would never bring similar claims of discrimination against the Auto Club. The Auto Club never requested any of those terms—as I said so in writing on May 4 (*see* Tab 6), and again during the September 10 phone conference.

16. By October, further requests for evidence had yielded nothing, no evidence of claims mishandling existed, and Mr. Akouri and Mr. Berry were avoiding discussion of the merits of the case and instead repeatedly using the threat of public disclosure to extract an extraordinary payment the Auto Club did not owe. Discussions toward resolution were discontinued.

17. I have reviewed the Complaint being filed on behalf of the Auto Club, and the factual allegations in paragraphs 26—30, 49—51, 54, 58—63, 65, and 67—72 are true and accurate to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 15th day of October, 2026 in Ann Arbor, Michigan.

Ryan D. Bohannon

**Tab 1**

**Subject:** Berry v. ACG--FRE/MRE 408 Confidential Communication
**Date:** Friday, January 9, 2026 at 6:12:00 PM Eastern Standard Time
**From:** Ryan Bohannon <rbohannon@khvpf.com>
**To:** R Akouri <akouripllc@yahoo.com>
**CC:** David Porter <dporter@khvpf.com>, Kimberly Matis <kmatis@khvpf.com>
**Attachments:** image001.png

Robert,

Thank you for our conversation today and for considering our request to investigate these allegations until the end of February.

As discussed, ACG has never received complaints of discriminatory claims-handling practices before and such conduct would be fundamentally inconsistent with its values and commitment to fair treatment of all members.

As I'm sure you know, the allegations of the draft complaint require ACG to investigate them. Completing this review requires substantial time. You have indicated that you would consider our request for cooperation with that investigation. Providing us with the specific claim numbers, claimant names, time periods, or any other evidence Mr. Berry believes demonstrates discrimination will focus our investigation. The draft complaint also mentions that Mr. Berry has conducted a comparative statistical analysis to prove his damages—that would also be useful to see so we have some understanding about how Mr. Berry is measuring alleged damages.

As I mentioned on our call, I will soon be out for a few weeks with the upcoming birth of my son, but our team will continue working without interruption. My partner, David Porter, will serve as your primary contact during my short absence should an urgent need arise. I'm copying him on this email.

Ryan

Ryan D. Bohannon
280 N. Old Woodward
Suite 400
Birmingham, MI 48009
O: (248) 645-0000
C: (586) 215-9426
rbohannon@khvpf.com
KIENBAUM | HARDY
VIVIANO | PELTON | FORREST

This communication may contain confidential or legally privileged information. If you believe you have received it in error, please notify the sender immediately and delete this message without copying or disclosing it.

**Tab 2**

**Subject:** Re: Berry VS ACG
**Date:** Friday, April 3, 2026 at 3:11:22 PM Eastern Daylight Time
**From:** R Akouri <akouripllc@yahoo.com>
**To:** Ryan Bohannon <rbohannon@khvpf.com>, David Groner <david.gronerplc@gmail.com>, Akouri & Associates <akouripllc@yahoo.com>
**CC:** Kimberly Matis <kmatis@khvpf.com>
**Attachments:** inky-injection-inliner-378a3dfdaa58fddbaa4a2cb78946f294.png, DeLima Discrimination Expert.pdf, Mark St. Peter, CCE CFE (Expert Testimony supplement 2023-2025) (1).pdf, Mark St. Peter, CCE CFE (Expert Testimony supplement 2023-2025).pdf, Calderone Team.pdf, AO Report (BB) - AAA (1).xlsx, AO Report (BB) - Auto Club (1).xlsx, AO Report (BB) - Fremont (1).xlsx, AO Report (BB) - Meemic (1).xlsx

External (akouripllc@yahoo.com)

AWECOMM

Report This Email FAQ Protection by INKY

Ryan:

Sorry about the delay but I wanted to make sure that we had a comprehensive summary as to our position and as this is also being emailed to our facilitator, I wanted to make sure our team made a good faith attempt to present a comprehensive summary as to what arguments we intend to advance at litigation. From our standpoint, Delsena Whitty affirmed to Hani Azakir the following relevant information (confirmed by a recorded conversation between both along with a statement under oath from independent witness, Mr. Azakir):

A. Race, ethnicity and religion play a roll in how claims are evaluated and paid,
B. These practices are influenced by the "highter-ups" within AAA,
C. Roundtable discussions include directives tied to geographic areas such as Dearborn, Detroit and Hamtramck-areas widely understood to correlate with Arab Amercian and African Amercian populations,
D. Similarly situated claims involving white or Caucasian individuals are treated more favorably, including materially higher settlement considerations.

Our position is that such evidence does not support an isolated incident, instead a patterns of discriminatory claim evaluation and settlement conduct exists within AAA. Upon reviewing Mr. Adam Berry's case history (please see below), Plaintiff will be able to identify a consistent pattern in which claims involving minority clients were:

A. Undervalued,
B. Subject to greater delay,
C. Unnessisary costs such as having to hire additional staff due to unnecessary burdens/delay,
D. More frequently denied claims.

If this proceeds to litigation, Plaintiff intends to pursue discovery into:

A. Internal claims-handling protocols,
B. Adjuster training and supervision,
C. Roundtable decision-making process,
D. Claim valuation data by geography and demographic indicators,
E. Internal communications referencing claims, attorneys and geographic regions.

Given the extensive matters to address, should litigation move forward, we have taken effort to retain the following experts and from a general standpoint our focus with said experts will probe:

A. **Beth DeLima** (please see attached resume below) will address our discrimination concerns, AAA's lack of protocols, training policies, etc. With said expert, we will want to probe what written policies govern how bodily injury and PIP claims are evaluated for settlement value. How adjusters are provide discretion or if they are guided by internal valuation frameworks or directives. What role do supervisors or management play in approving or influencing settlement decisions, are claims ever discussed in a group setting (roundtables, committees or supervisory reviews and if so, who participates and what factors are considered)? How does AAA track claim data by geographic location (zip code/city/region)? How are claims evaluated differently based on location? Are certain regions flagged as "higher risk" or subject to additional scrutiny? What internal guidance exists regarding claims originating from: Dearborn/Detroit/Hamtramck? What training and supplemental training do adjusters receive regarding fair claims handling and anti-discrimination obligations? Does AAA conduct internal audits of claim outcomes? Are audits performed to detect disparities in: settlement values, claims denials or claims delays? Has AAA ever analyzed whether claim outcomes differ based on: geographic, claimant demographics or representing attorneys? Are adjusters evaluated on claim payout amounts, claim closure rates or loss ratios and are incentives tied to reducing claim payouts? Has AAA received prior complaints (including those claims not litigated) or allegations of discriminatory claims handing, how were they investigated, handled and resolved?

B. **Mark St. Peter** (pease see his attached case load below) will address a computer forensic evaluation to cross over on issues /concerns of Beth DeLima along with concerns as to AAA's record keeping policies/protocols. Per your email, you stated that AAA does not maintain recordings after a certain period of time. **Kindly remember that you promised to provide us AAA's written protocols/policies as to records retentions; please provide in due course**. He would also probe if AAA records inbound and outbound calls involving adjusters, under what circumstances are calls recorded? Are Adjusters aware of when calls are recorded? Are recordings stored automatically or selectively? Mr. St. Peters will also probe why AAA has a retention policy, what is the retention policy for call recordings, claim notes and internal communications? We will probe how long recordings are maintained, why recordings are destroyed at a certain time, are recordings ever deleted or overwritten, can deleted or overwritten recordings be recovered, what is the protocol for the scheduled date of deletion/overwrite? A recordings deleted/overwritten automatically or manually? Are there any policies governing preservation of evidence once a dispute arises? Was there any preservation hold implemented in this matter? Have any recordings, notes or communications related to this claim been generated, deleted or destroyed? **Again, your contact with me confirms that your team has throughly investigated this matter, did not find any basis for the claims made by my client and that the recordings on your side no longer exist.**

C. Tammy Berry (please see her resume and Calderone Advisory Group's credentials) will address our hard financial losses (not including violations of Elliott-Larson Civil Rights Act, Fraudulent Misrepresentation, Civil Conspiracy, Michigan Consumer Protection Act, Michigan's Unfair Trade Practices, Breach of Implied Covenant Good Faith Dealings & 42 U.S.C, 1981).

Finally, you asked that I provide you the breakdown of claims controlled by Mr. Berry (please see below). Our position is that if we litigate, we will be taking extensive depositions of a lot of current and past adjusters to probe the concerns raised herein. We feel that there are extensive issues which will become uncovered should we press forward, coupled with an expansion of a Plaintiff base. As per my client, we are willing to work in good faith to find a solution but this will take AAA and its affiliates to realize an internal problem exists, that we find a fair common ground to settle coupled with the expectation that AAA will want a confidentiality agreement to also be signed by my client.

Thank you,
Robert Akouri

**Akouri & Associates P.L.L.C.**
**18306 Middlebelt Road**
**Livonia, Michigan 48152**
**Phone: (313) 584-1404**

On Wednesday, April 1, 2026 at 07:09:39 PM EDT, Ryan Bohannon <rbohannon@khvpf.com> wrote:

Robert,

I haven't heard from you on this and I'm passed the time where I can make any meaningful assessment of the evidence you've promised. Please advise whether Mr. Berry is producing anything and if so, when.

Thanks,

Ryan

---

**From:** Ryan Bohannon
**Sent:** Monday, March 23, 2026 3:04 PM
**To:** R Akouri <akouripllc@yahoo.com>
**Cc:** Kimberly Matis <kmatis@khvpf.com>
**Subject:** RE: Berry VS ACG

Robert,

Following up about the data you promised to provide that supports Plaintiff's theory. If you would like ACG to consider this data/evidence at mediation, I'll need it by the beginning of next week.

Thank you,

Ryan

---

**From:** R Akouri <akouripllc@yahoo.com>
**Sent:** Monday, March 9, 2026 4:36 PM
**To:** Ryan Bohannon <rbohannon@khvpf.com>
**Cc:** Kimberly Matis <kmatis@khvpf.com>
**Subject:** Re: Berry VS ACG

Ryan:

Now that you have put in writing confirmation that we can facilitate this matter, I will reach out to my client to provide the list of cases which we believe applies; I will try to get this package out to you by the end of the week.  Before nailing down a location, I suggest that we touch base with Judge Groner to see how he wants us to proceed.  Following Judge Groner's direction, we can nail down a location; I look forward to continued discussions.

I will be shooting out an email by tonight to Judge Groner and you confirming his nomination.

Robert Akouri

**Akouri & Associates P.L.L.C.**
**18306 Middlebelt Road**
**Livonia, Michigan 48152**
**Phone: (313) 584-1404**

On Monday, March 9, 2026 at 04:30:44 PM EDT, Ryan Bohannon <rbohannon@khvpf.com> wrote:

Robert,

ACG will agree to mediate with Judge Groner, provided Mr. Berry produces the cases he's alleging were discriminatory and the evidence supporting those allegations. We'd like to host at our Birmingham office—we have three full-size private conference rooms available for the day.

Ryan

---

**From:** R Akouri <akouripllc@yahoo.com>
**Sent:** Monday, March 2, 2026 2:50 PM
**To:** Ryan Bohannon <rbohannon@khvpf.com>; Akouri & Associates <akouripllc@yahoo.com>
**Subject:** Re: Berry VS ACG

Ryan:

I can make time to take a call to lock down the facilitation this Thursday.; I will be before Hon. K. Viviano this Thursday but I should be able to make a breakaway to discuss this matter with you.

I would prefer that we stay in the lane of Judge Groner as again, the question is did these cases settle for fair market value? We believe that they should have settled for more had the attorney/clients not been Arabic/African American. We will continue to materially disagree as we believe we do have a measurable element of damage and we believe that the losses are tied to Michigan No-Fault cases. I believe that the correct place to contain a substantial claim is in the mediation process. Lawsuits and pleadings are open to the public; I promised to work in good faith and at the direction of my client who will entertain a fair resolution. To that end, we again reaffirm that we think that Judge Groner is the right mediator.

Assuming we agree to facilitate with Judge Groner, we are prepared to sign a protective order as between the parties. We will then release the documents which substantiate our element of damage and are willing to address any other issues through an agreement to participate in discovery. I look forward to our call this week. Please feel free to reach out to me via cell at 248-379-3389 to discuss this Thursday morning.

Robert Akouri

**Akouri & Associates P.L.L.C.**

**18306 Middlebelt Road**

**Livonia, Michigan 48152**

**Phone: (313) 584-1404**

On Monday, March 2, 2026 at 12:29:27 PM EST, Ryan Bohannon <rbohannon@khvpf.com> wrote:

Robert,

Are you available Thursday morning to discuss mediator selection? We are open to considering Judge Groner, but given that every one of Mr. Berry's claims turns on proving discrimination—even though he himself does not allege he was discriminated against—I'd recommend we also explore a mediator with deep civil rights experience. Dave Calzone stands out as another strong option in this space.

On Justice Viviano: we need to strike him from the list. He serves as "of counsel" to our firm, his brother Joe is my partner who leads our commercial practice, and if the case doesn't resolve, I expect to bring Joe in as attorney of record.

As for your document request, I'm not aware of any applicable retention policy. I can inquire, but I'm

hesitant to provide one-way discovery when Mr. Berry has not authorized release of his alleged evidence. Your draft complaint references an investigation that Mr. Berry conducted and determinations that stemmed from that investigation. (See Paragraphs 25-28.) If true, I'd again urge you to share those documents and findings to help ACG's internal investigation.

We already know Mr. Berry's client's claims against ACG over the years. We've reviewed them thoroughly. They do not evidence any form of disparate treatment.

Ryan

---

**From:** R Akouri <akouripllc@yahoo.com>
**Sent:** Monday, March 2, 2026 8:55 AM
**To:** Ryan Bohannon <rbohannon@khvpf.com>
**Cc:** Akouri & Associates <akouripllc@yahoo.com>
**Subject:** Re: Berry VS ACG

Ryan:

As we are in March and are crawling upon our agreed upon deadline, I wanted to circle back with you as to the proposed names to facilitate this matter; on February 23, 2026 I shot over 3 names we would agree to facilitate this matter through. You stated per our prior phone call, you were going to probe facilitation with your client as you had an appointment to discuss this matter later that week. Were are with with this first issue?

Secondly, you stated with prior email of January 20. 2026 that AAA does not retain recordings of phone calls. I would like to know if AAA has a written "retention policy" and if so, I would like to review it along with any amendments to any such policies. Again, I am prepared to release my history of claims my client has with AAA and its affiliates should we agree to facilitate. If not we will continue down the process of litigation.

Kindly let me know where we stand on these issues.

Thank you,

Robert Akouri

**Akouri & Associates P.L.L.C.**

**18306 Middlebelt Road**

**Livonia, Michigan 48152**

**Phone: (313) 584-1404**

On Monday, February 23, 2026 at 11:41:35 AM EST, R Akouri <akouripllc@yahoo.com> wrote:

Ryan:

Hopefully your procedure goes well.

Candidly, we are not comfortable with Meghan Norris as our facilitator. As we would consider pursuing this matter is State court for our claims coupled with the fact that the issues all tie into Michigan No-Fault Law we would want your team to choose from the following names:

**A. Retired Circuit Court Judge David Groner (Wayne County Circuit Court),**

**B. Retired Circuit Court Judge Michael Hatty (Livingston County Circuit Court),**

**C. Retired Judge David Viviano (Michigan Supreme Court)**

Kindly let me know which person you will entertain as I would like to report back to my client that we have a facilitator. I would like to nail down a facilitation date within the month of March. I await your reply to this email again, I hope you recover quickly.

Robert Akouri

**Akouri & Associates P.L.L.C.**

**18306 Middlebelt Road**

**Livonia, Michigan 48152**

**Phone: (313) 584-1404**

On Monday, February 23, 2026 at 11:16:01 AM EST, Ryan Bohannon <rbohannon@khvpf.com> wrote:

Robert,

I'm writing to let you know that I am undergoing a minor medical procedure tomorrow, and I'll be out for the next few days. However, I expect to have a firm answer on mediation by the end of the week or the earlier part of next week.

Have you given any consideration to Megan Norris for this matter? I'll be in touch as soon as I have an answer from ACG.

Ryan

---

**From:** Ryan Bohannon
**Sent:** Tuesday, January 20, 2026 10:17 AM
**To:** 'R Akouri' <akouripllc@yahoo.com>
**Cc:** David Porter <dporter@khvpf.com>; Kimberly Matis <kmatis@khvpf.com>
**Subject:** RE: Berry VS ACG

Robert,

Thank you for the well wishes. We anticipate the big day will arrive Thursday or soon thereafter. I will be unavailable for a short time, so I've included my partner David on this email. Please copy him on all correspondence moving forward.

ACG does not retain recordings of phone calls and wouldn’t have an alleged recording from September 2024. We continue investigating the allegations in Mr. Berry’s draft complaint, which demands substantial time to complete thoroughly. We again want to emphasize that Mr. Berry’s cooperation would expedite this process—specifically, if he provides his analysis supporting his claims and details demonstrating the alleged discrimination and alleged damage calculation, we can focus our investigation more efficiently.

Ryan

---

**From:** R Akouri <akouripllc@yahoo.com>
**Sent:** Friday, January 16, 2026 9:15 AM
**To:** Ryan Bohannon <rbohannon@khvpf.com>; Akouri & Associates <akouripllc@yahoo.com>
**Subject:** Berry VS ACG

Ryan:

Work is work and that won't change; more importantly, I hope your wife delivered a healthy baby.

Now work issues......Last week, I notified you of the date of the initial recording as between the adjuster and attorney/witness Azakir, that being 9/96/24 between 11am-12pm. I would like to know when we can expect said recording.

Kindly take notice that our office has:
1. Agreed to refrain from filing our complaint until March, 2026,
2. We have already provided Mr. Kramer a draft of our complaint,
3. We have also provided Mr. Kramer one of the recordings as between Mr. Azakir and your adjuster,

4. We have provided Mr. Kramer a statement under oath of Mr. Azakir.

Given the totality of our actions, we believe we are working in good faith to find a solution but again, we did request both the preservation of the initial recording coupled with a copy for our review. Kindly tell us where we are with the release of said initial recording as between your adjuster and Mr. Azakir.

Finally, I am aware that you have also requested our layout of claims which we presume apply to our potential lawsuit. I have this documentation prepared and am willing to release it following the agreement to facilitate/appointment of a facilitator. If not, we will eventually be releasing it via discovery through litigation. We leave you to direct us as to how we will proceed.

**Akouri & Associates P.L.L.C.**

**18306 Middlebelt Road**

**Livonia, Michigan 48152**

**Phone: (313) 584-1404**

**Tab 3**

**Subject:** RE: Mediation claims by Adam Berry, Esq. as to AAA and its affiliates
**Date:** Tuesday, March 10, 2026 at 11:33:00 AM Eastern Daylight Time
**From:** Ryan Bohannon <rbohannon@khvpf.com>
**To:** David Groner <david.gronerplc@gmail.com>
**CC:** Joe Viviano <jviviano@khvpf.com>, R Akouri <akouripllc@yahoo.com>
**Attachments:** image001.png, image002.png

Judge Groner,

Joe Viviano and I represent The Auto Club Group in this matter and look forward to working with you.

We will reserve the specifics of ACG's defenses for the mediation process, but the short version is this: every one of Mr. Berry's claims is legally deficient, there is no competent evidence that ACG discriminated against anyone in its claims-handling process, and even if he could clear those insurmountable barriers, his damages theory--premised on what he *might* have recovered in cases he chose to settle--is entirely speculative. Mr. Berry's claim, to put it charitably, is novel.

On logistics, ACG would prefer to hold the mediation in person at our office in Birmingham, Michigan, and we are happy to work around your schedule to find a mutually convenient date.

Ryan

Ryan D. Bohannon
280 N. Old Woodward
Suite 400
Birmingham, MI 48009
O: (248) 645-0000
C: (586) 215-9426
rbohannon@khvpf.com
KIENBAUM | HARDY
VIVIANO | PELTON | FORREST

This communication may contain confidential or legally privileged information. If you believe you have received it in error, please notify the sender immediately and delete this message without copying or disclosing it.

---

**From:** R Akouri <akouripllc@yahoo.com>
**Sent:** Tuesday, March 10, 2026 11:13 AM
**To:** David Groner <david.gronerplc@gmail.com>

**Cc:** Ryan Bohannon <rbohannon@khvpf.com>; Akouri & Associates <akouripllc@yahoo.com>
**Subject:** Re: Mediation claims by Adam Berry, Esq. as to AAA and its affiliates

External (akouripllc@yahoo.com)

AWECOMM

Report This Email FAQ Protection by INKY

**Plaintiff's Position**:, Adam Berry has drafted a complaint and has not filed it as of yet as he agreed to hold off in filing should we resolve our differences via facilitation/mediation (Please See Attached). Mr. Berry is an Arab American lawyer who represents a substantial number of 1st party clients (both African American & Arab American-Mr. Berry will attribute approximately 20,000,000.00 in claims to said clients). An Independent Witness/Lawyer in Good Standing (Mr. H. Azakir) had a chance to speak to an AAA adjuster who admitted that African Americans and Arab Americans claims are treated differently that Anglo-Saxon Americans (Please review Statement Under Oath & Recording of Adjuster authored by Mr. Azakir).

Plaintiff believes that his claims were intentionally undervalued by AAA and its affiliates as the insureds he represented were not Anglo-Saxon Americans; consequently, Mr. Berry's cases were settled for a lower value. Had he known he and his clients were treated differently, he would have demanded a better settlement of the cases maintained / serviced by him and his firm.

**Akouri & Associates P.L.L.C.**
**18306 Middlebelt Road**
**Livonia, Michigan 48152**
**Phone: (313) 584-1404**

On Tuesday, March 10, 2026 at 10:07:02 AM EDT, David Groner <david.gronerplc@gmail.com> wrote:

Thank you for your request. What type of case is this? This information helps with scheduling.

Please forward a CURRENT caption and advise what time frame you were looking at. Currently, Judge Groner's first available dates are in June.

Debbie
Administrative Asst. to Judge David Groner (Ret'd)

On Tue, Mar 10, 2026 at 5:30 AM R Akouri <akouripllc@yahoo.com> wrote:

> Good Morning Judge Groner:
>
> As of yesterday, myself (on behalf of Adam Berry, Esq) and attorney Ryan Bohannon (on behalf of AAA and its affiliates) have agreed to appoint you as our facilitator relative to a claim asserted by Mr. Berry.
>
> Kindly reach out to myself and Mr. Bohannon so as to confirm your acceptance of

appointment, what you would like of both teams by way of initial documentation and how you would like to structure moving forward. We both look forward to your guidance and assistance as to our clients' concerns.

Thank you,
Robert Akouri

**Akouri & Associates P.L.L.C.**
**18306 Middlebelt Road**
**Livonia, Michigan 48152**
**Phone: (313) 584-1404**

**Tab 4**

**Subject:** Re: Berry VS ACG
**Date:** Friday, April 3, 2026 at 5:52:56 PM Eastern Daylight Time
**From:** R Akouri <akouripllc@yahoo.com>
**To:** Ryan Bohannon <rbohannon@khvpf.com>, Akouri & Associates <akouripllc@yahoo.com>
**Attachments:** inky-injection-inliner-378a3dfdaa58fddbaa4a2cb78946f294.png

External (akouripllc@yahoo.com)

Report This Email FAQ Protection by INKY

Ryan:

For starts, each and every case presented was a case controlled by Adam Berry's firm. Adam is the principal of the firm; clearly he has standing as to the cases presented to you.

Secondly, I indicated to you that we were going to present the list of cases where his firm represented either African Amercian or Arab Amercian clients. The spreadsheets presented to you (the folders I referenced in the prior email today) are the very cases I indicated I promised I would give you (again, per our conversation last month, I indicated that AAA could easily pull up the cases "with the stroke of a key") and that the reason AAA wants is from us is to determine if we knew what total exposure would be; again, I told you that my client kept detailed records of cases. The fact that you now claim that some of these cases are over 10 years old will not excuse your client's actions as we just found out about AAA's behavior within the last year......We believe our standing is valid.

You now want me to go through each case, present a value and calculation as to what I believe my losses are. I never agreed to the terms you are now claiming. I have experts and when I get to the point of trial, I will will lay out my measure of damages. To date, you have been making requests of me, yet, I have not been provided any information from your side. No explanation as to how and what your your investigations yielded, your internal review and determination as to how you believe that there was no prejudice/damage at all on behalf of AAA. Kindly explain and when you can, please provide me the written protocols you spoke of regarding retention policies.

Robert Akouri

**Akouri & Associates P.L.L.C.**
**18306 Middlebelt Road**
**Livonia, Michigan 48152**
**Phone: (313) 584-1404**

On Friday, April 3, 2026 at 05:29:21 PM EDT, Ryan Bohannon <rbohannon@khvpf.com> wrote:

Which "folders" are you referring to? What I received are the four attached spreadsheets—downloaded data from somewhere, it appears. For what it's worth, Mr. Berry isn't listed as attorney of record on any of them; others are—and I don't understand how this shows anything relevant.

What I thought I was going to receive was a listing of the cases Mr. Berry worked on in which

he claims his contingency fee was tainted by alleged discrimination, with an explanation of why he asserts discriminatory practices in that specific case, along with some methodology for calculating damages. What you produced is lists of random cases that don't appear to have anything to do with Mr. Berry and that date back as far as 12 years ago.

Again, at this point, I just want to make sure you've sent me everything you intended. Please confirm. If I'm missing folders or other documents, please send them to me.

---

**From:** R Akouri <akouripllc@yahoo.com>
**Sent:** Friday, April 3, 2026 5:07 PM
**To:** David Groner <david.gronerplc@gmail.com>; Ryan Bohannon <rbohannon@khvpf.com>
**Cc:** Kimberly Matis <kmatis@khvpf.com>
**Subject:** Re: Berry VS ACG

Ryan:

Per Adam, the several folders presented were predominantly clients which were either African American or Arabic American. Our position is that we believe that the cases presented should have settled for a larger amount with a quicker turnaround time and coupled with more incurred expenses.

Robert
**Akouri & Associates P.L.L.C.**
**18306 Middlebelt Road**
**Livonia, Michigan 48152**
**Phone: (313) 584-1404**

On Friday, April 3, 2026 at 04:53:02 PM EDT, Ryan Bohannon <rbohannon@khvpf.com> wrote:

Robert,

I want to confirm I received everything you intended to send. What I have are four expert witness resumes and four spreadsheets containing thousands of claims that appear to have been downloaded from an external source. Am I missing anything?

What I don't have—and was expecting—is any identification of the specific claims Mr. Berry contends were tainted by discrimination, evidence supporting that claim, or any basis for valuing his alleged damages.

If this is the full production, just say the word. I wanted to check before assuming.

Ryan

---

**From:** R Akouri <akouripllc@yahoo.com>
**Sent:** Friday, April 3, 2026 3:10 PM
**To:** Ryan Bohannon <rbohannon@khvpf.com>; David Groner <david.gronerplc@gmail.com>; Akouri & Associates <akouripllc@yahoo.com>
**Cc:** Kimberly Matis <kmatis@khvpf.com>
**Subject:** Re: Berry VS ACG

Ryan:

Sorry about the delay but I wanted to make sure that we had a comprehensive summary as to our position and as this is also being emailed to our facilitator, I wanted to make sure our team made a good faith attempt to present a comprehensive summary as to what arguments we intend to advance at litigation. From our standpoint, Delsena Whitty affirmed to Hani Azakir the following relevant information (confirmed by a recorded conversation between both along with a statement under oath from independent witness, Mr. Azakir):

A. Race, ethnicity and religion play a roll in how claims are evaluated and paid,
B. These practices are influenced by the "highter-ups" within AAA,
C. Roundtable discussions include directives tied to geographic areas such as Dearborn, Detroit and Hamtramck-areas widely understood to correlate with Arab Amercian and African Amercian populations,
D. Similarly situated claims involving white or Caucasian individuals are treated more favorably, including materially higher settlement considerations.

Our position is that such evidence does not support an isolated incident, instead a patterns of discriminatory claim evaluation and settlement conduct exists within AAA. Upon reviewing Mr. Adam Berry's case history (please see below), Plaintiff will be able to identify a consistent pattern in which claims involving minority clients were:

A. Undervalued,
B. Subject to greater delay,
C. Unnessisary costs such as having to hire additional staff due to unnecessary burdens/delay,
D. More frequently denied claims.

If this proceeds to litigation, Plaintiff intends to pursue discovery into:

A. Internal claims-handling protocols,
B. Adjuster training and supervision,
C. Roundtable decision-making process,
D. Claim valuation data by geography and demographic indicators,
E. Internal communications referencing claims, attorneys and geographic regions.

Given the extensive matters to address, should litigation move forward, we have taken effort to retain the following experts and from a general standpoint our focus with said experts will probe:

A. **Beth DeLima** (please see attached resume below) will address our discrimination concerns, AAA's lack of protocols, training policies, etc. With said expert, we will want to probe what written policies govern how bodily injury and PIP claims are evaluated for settlement value. How adjusters are provide discretion or if they are guided by internal valuation frameworks or directives. What role do supervisors or management play

in approving or influencing settlement decisions, are claims ever discussed in a group setting (roundtables, committees or supervisory reviews and if so, who participates and what factors are considered)? How does AAA track claim data by geographic location (zip code/city/region)? How are claims evaluated differently based on location? Are certain regions flagged as "higher risk" or subject to additional scrutiny? What internal guidance exists regarding claims originating from: Dearborn/Detroit/Hamtramck? What training and supplemental training do adjusters receive regarding fair claims handling and anti-discrimination obligations? Does AAA conduct internal audits of claim outcomes? Are audits performed to detect disparities in: settlement values, claims denials or claims delays? Has AAA ever analyzed whether claim outcomes differ based on: geographic, claimant demographics or representing attorneys? Are adjusters evaluated on claim payout amounts, claim closure rates or loss ratios and are incentives tied to reducing claim payouts? Has AAA received prior complaints (including those claims not litigated) or allegations of discriminatory claims handing, how were they investigated, handled and resolved?

B. **Mark St. Peter** (pease see his attached case load below) will address a computer forensic evaluation to cross over on issues /concerns of Beth DeLima along with concerns as to AAA's record keeping policies/protocols. Per your email, you stated that AAA does not maintain recordings after a certain period of time. **Kindly remember that you promised to provide us AAA's written protocols/policies as to records retentions; please provide in due course**. He would also probe if AAA records inbound and outbound calls involving adjusters, under what circumstances are calls recorded? Are Adjusters aware of when calls are recorded? Are recordings stored automatically or selectively? Mr. St. Peters will also probe why AAA has a retention policy, what is the retention policy for call recordings, claim notes and internal communications? We will probe how long recordings are maintained, why recordings are destroyed at a certain time, are recordings ever deleted or overwritten, can deleted or overwritten recordings be recovered, what is the protocol for the scheduled date of deletion/overwrite? A recordings deleted/overwritten automatically or manually? Are there any policies governing preservation of evidence once a dispute arises? Was there any preservation hold implemented in this matter? Have any recordings, notes or communications related to this claim been generated, deleted or destroyed? **Again, your contact with me confirms that your team has throughly investigated this matter, did not find any basis for the claims made by my client and that the recordings on your side no longer exist.**

C. Tammy Berry (please see her resume and Calderone Advisory Group's credentials) will address our hard financial losses (not including violations of Elliott-Larson Civil Rights Act, Fraudulent Misrepresentation, Civil Conspiracy, Michigan Consumer Protection Act, Michigan's Unfair Trade Practices, Breach of Implied Covenant Good Faith Dealings & 42 U.S.C, 1981).

Finally, you asked that I provide you the breakdown of claims controlled by Mr. Berry (please see below). Our position is that if we litigate, we will be taking extensive depositions of a lot of current and past adjusters to probe the concerns raised herein. We feel that there are extensive issues which will become uncovered should we press forward, coupled with an expansion of a Plaintiff base. As per my client, we are willing to work in good faith to find a solution but this will take AAA and its affiliates to realize an internal problem exists, that we find a fair common ground to settle coupled with the expectation that AAA will want a confidentiality agreement to also be signed by my client.

Thank you,
Robert Akouri

**Akouri & Associates P.L.L.C.**
**18306 Middlebelt Road**
**Livonia, Michigan 48152**
**Phone: (313) 584-1404**

On Wednesday, April 1, 2026 at 07:09:39 PM EDT, Ryan Bohannon <rbohannon@khvpf.com> wrote:

Robert,

I haven't heard from you on this and I'm passed the time where I can make any meaningful assessment of the evidence you've promised. Please advise whether Mr. Berry is producing anything and if so, when.

Thanks,

Ryan

---

**From:** Ryan Bohannon
**Sent:** Monday, March 23, 2026 3:04 PM
**To:** R Akouri <akouripllc@yahoo.com>
**Cc:** Kimberly Matis <kmatis@khvpf.com>
**Subject:** RE: Berry VS ACG

Robert,

Following up about the data you promised to provide that supports Plaintiff's theory. If you would like ACG to consider this data/evidence at mediation, I'll need it by the beginning of next week.

Thank you,

Ryan

---

**From:** R Akouri <akouripllc@yahoo.com>
**Sent:** Monday, March 9, 2026 4:36 PM
**To:** Ryan Bohannon <rbohannon@khvpf.com>
**Cc:** Kimberly Matis <kmatis@khvpf.com>
**Subject:** Re: Berry VS ACG

Ryan:

Now that you have put in writing confirmation that we can facilitate this matter, I will reach out to my client to provide the list of cases which we believe applies; I will try to get this package out to you by the end of the week. Before nailing down a location, I suggest that we touch base with Judge Groner to see how he wants us to proceed. Following Judge Groner's direction, we can nail down a location; I look forward to continued discussions.

I will be shooting out an email by tonight to Judge Groner and you confirming his nomination.

Robert Akouri

**Akouri & Associates P.L.L.C.**
**18306 Middlebelt Road**
**Livonia, Michigan 48152**
**Phone: (313) 584-1404**

On Monday, March 9, 2026 at 04:30:44 PM EDT, Ryan Bohannon <rbohannon@khvpf.com> wrote:

Robert,

ACG will agree to mediate with Judge Groner, provided Mr. Berry produces the cases he's alleging were discriminatory and the evidence supporting those allegations. We'd like to host at our Birmingham office—we have three full-size private conference rooms available for the day.

Ryan

---

**From:** R Akouri <akouripllc@yahoo.com>
**Sent:** Monday, March 2, 2026 2:50 PM
**To:** Ryan Bohannon <rbohannon@khvpf.com>; Akouri & Associates <akouripllc@yahoo.com>
**Subject:** Re: Berry VS ACG

Ryan:

I can make time to take a call to lock down the facilitation this Thursday.; I will be before Hon. K. Viviano this Thursday but I should be able to make a breakaway to discuss this matter with you.

I would prefer that we stay in the lane of Judge Groner as again, the question is did these cases settle for fair market value? We believe that they should have settled for more had the attorney/clients not been Arabic/African American. We will continue to materially disagree as we believe we do have a measurable element of damage and we believe that the losses are tied to Michigan No-Fault cases. I believe that the correct place to contain a substantial claim is in the mediation process. Lawsuits and pleadings are open to the public; I promised to work in good faith and at the direction of my client who will entertain a fair resolution. To that end, we again reaffirm that we think that Judge Groner is the right mediator.

Assuming we agree to facilitate with Judge Groner, we are prepared to sign a protective order as between the parties. We will then release the documents which substantiate our element of damage and are willing to address any other issues through an agreement to participate in discovery. I look forward to our call this week. Please feel free to reach out to me via cell at 248-379-3389 to discuss this Thursday morning.

Robert Akouri

**Akouri & Associates P.L.L.C.**

**18306 Middlebelt Road**

**Livonia, Michigan 48152**

**Phone: (313) 584-1404**

On Monday, March 2, 2026 at 12:29:27 PM EST, Ryan Bohannon <rbohannon@khvpf.com> wrote:

Robert,

Are you available Thursday morning to discuss mediator selection? We are open to considering Judge Groner, but given that every one of Mr. Berry's claims turns on proving discrimination—even though he himself does not allege he was discriminated against—I'd recommend we also explore a mediator with deep civil rights experience. Dave Calzone stands out as another strong option in this space.

On Justice Viviano: we need to strike him from the list. He serves as "of counsel" to our firm, his brother Joe is my partner who leads our commercial practice, and if the case doesn't resolve, I expect to bring Joe in as attorney of record.

As for your document request, I'm not aware of any applicable retention policy. I can inquire, but I'm

hesitant to provide one-way discovery when Mr. Berry has not authorized release of his alleged evidence. Your draft complaint references an investigation that Mr. Berry conducted and determinations that stemmed from that investigation. (See Paragraphs 25-28.) If true, I'd again urge you to share those documents and findings to help ACG's internal investigation.

We already know Mr. Berry's client's claims against ACG over the years. We've reviewed them thoroughly. They do not evidence any form of disparate treatment.

Ryan

---

**From:** R Akouri <akouripllc@yahoo.com>
**Sent:** Monday, March 2, 2026 8:55 AM
**To:** Ryan Bohannon <rbohannon@khvpf.com>
**Cc:** Akouri & Associates <akouripllc@yahoo.com>
**Subject:** Re: Berry VS ACG

Ryan:

As we are in March and are crawling upon our agreed upon deadline, I wanted to circle back with you as to the proposed names to facilitate this matter; on February 23, 2026 I shot over 3 names we would agree to facilitate this matter through. You stated per our prior phone call, you were going to probe facilitation with your client as you had an appointment to discuss this matter later that week. Were are with with this first issue?

Secondly, you stated with prior email of January 20. 2026 that AAA does not retain recordings of phone calls. I would like to know if AAA has a written "retention policy" and if so, I would like to review it along with any amendments to any such policies. Again, I am prepared to release my history of claims my client has with AAA and its affiliates should we agree to facilitate. If not we will continue down the process of litigation.

Kindly let me know where we stand on these issues.

Thank you,

Robert Akouri

**Akouri & Associates P.L.L.C.**

**18306 Middlebelt Road**

**Livonia, Michigan 48152**

**Phone: (313) 584-1404**

On Monday, February 23, 2026 at 11:41:35 AM EST, R Akouri <akouripllc@yahoo.com> wrote:

Ryan:

Hopefully your procedure goes well.

Candidly, we are not comfortable with Meghan Norris as our facilitator. As we would consider pursuing this matter is State court for our claims coupled with the fact that the issues all tie into Michigan No-Fault Law we would want your team to choose from the following names:

**A. Retired Circuit Court Judge David Groner (Wayne County Circuit Court),**

**B. Retired Circuit Court Judge Michael Hatty (Livingston County Circuit Court),**

**C. Retired Judge David Viviano (Michigan Supreme Court)**

Kindly let me know which person you will entertain as I would like to report back to my client that we have a facilitator. I would like to nail down a facilitation date within the month of March. I await your reply to this email again, I hope you recover quickly.

Robert Akouri

**Akouri & Associates P.L.L.C.**

**18306 Middlebelt Road**

**Livonia, Michigan 48152**

**Phone: (313) 584-1404**

On Monday, February 23, 2026 at 11:16:01 AM EST, Ryan Bohannon <rbohannon@khvpf.com> wrote:

Robert,

I'm writing to let you know that I am undergoing a minor medical procedure tomorrow, and I'll be out for the next few days. However, I expect to have a firm answer on mediation by the end of the week or the earlier part of next week.

Have you given any consideration to Megan Norris for this matter? I'll be in touch as soon as I have an answer from ACG.

Ryan

---

**From:** Ryan Bohannon
**Sent:** Tuesday, January 20, 2026 10:17 AM
**To:** 'R Akouri' <akouripllc@yahoo.com>
**Cc:** David Porter <dporter@khvpf.com>; Kimberly Matis <kmatis@khvpf.com>
**Subject:** RE: Berry VS ACG

Robert,

Thank you for the well wishes. We anticipate the big day will arrive Thursday or soon thereafter. I will be unavailable for a short time, so I've included my partner David on this email. Please copy him on all correspondence moving forward.

ACG does not retain recordings of phone calls and wouldn't have an alleged recording from September 2024. We continue investigating the allegations in Mr. Berry's draft complaint, which demands substantial time to complete thoroughly. We again want to emphasize that Mr. Berry's cooperation would expedite this process—specifically, if he provides his analysis supporting his claims and details demonstrating the alleged discrimination and alleged damage calculation, we can focus our investigation more efficiently.

Ryan

---

**From:** R Akouri <akouripllc@yahoo.com>
**Sent:** Friday, January 16, 2026 9:15 AM
**To:** Ryan Bohannon <rbohannon@khvpf.com>; Akouri & Associates <akouripllc@yahoo.com>
**Subject:** Berry VS ACG

Ryan:

Work is work and that won't change; more importantly, I hope your wife delivered a healthy baby.

Now work issues......Last week, I notified you of the date of the initial recording as between the adjuster and attorney/witness Azakir, that being 9/96/24 between 11am-12pm. I would like to know when we can expect said recording.

Kindly take notice that our office has:
1. Agreed to refrain from filing our complaint until March, 2026,
2. We have already provided Mr. Kramer a draft of our complaint,
3. We have also provided Mr. Kramer one of the recordings as between Mr. Azakir and your adjuster,

4. We have provided Mr. Kramer a statement under oath of Mr. Azakir.

Given the totality of our actions, we believe we are working in good faith to find a solution but again, we did request both the preservation of the initial recording coupled with a copy for our review. Kindly tell us where we are with the release of said initial recording as between your adjuster and Mr. Azakir.

Finally, I am aware that you have also requested our layout of claims which we presume apply to our potential lawsuit. I have this documentation prepared and am willing to release it following the agreement to facilitate/appointment of a facilitator. If not, we will eventually be releasing it via discovery through litigation. We leave you to direct us as to how we will proceed.

**Akouri & Associates P.L.L.C.**

**18306 Middlebelt Road**

**Livonia, Michigan 48152**

**Phone: (313) 584-1404**

**Tab 5**

**Subject:** Berry VS AAA
**Date:** Monday, April 6, 2026 at 7:35:49 AM Eastern Daylight Time
**From:** R Akouri <akouripllc@yahoo.com>
**To:** Ryan Bohannon <rbohannon@khvpf.com>, Akouri & Associates <akouripllc@yahoo.com>
**Attachments:** inky-injection-inliner-378a3dfdaa58fddbaa4a2cb78946f294.png

External (akouripllc@yahoo.com)

Report This Email FAQ Protection by INKY

Ryan:

My bad,....... I had a meeting with my client this morning to go over the spreadsheets and yes, there are names of other law firms within said spreadsheets. The names of the other law firms are other Attorneys/Law Firms that were either representing the injured party or were attorneys accountable to the Funding Company (which Mr. Berry worked for) from a 1st party standpoint. Adam Berry's firm represented the funding company tied to the names on the spreadsheets presented to you. Mr. Berry wore two (2) hats as it relates to the speadsheets as he was also tasked with servicing the cases listed on the spreadsheets presented to you. Essentially his firm was not only handling 1st party cases against AAA directly on behalf of the funding company, he was also representing a funding company's interest in Michigan. Therefore, Adam's firm also directed / controlled all other law firms (within Michigan) working on claims owned by these funding companies. Should we go to litigation, I will amend the draft complaint to reflect these facts.

Again, Mr. Berry's firm decided on when to settle, litigate or facilitate cases with other law firms against AAA. The fact that we believe that AAA has a course, conduct and habit of discrimination as to 1st party cases within Michigan, not only affects the cases directly managed by Mr. Berry's firm but said discrimination also affects the management/control of firms (working on behalf of the Funding Companies) and report to Mr. Berry. We believe that a number of cases were delayed and not timely settled due to this discrimination, the settlement proceeds were also reduced for the same reasons. Bottom line profits were lost by being forced to hire more staff to manage the criminal amount of blanket denials as well as collecting lower settlement amounts due to AAA's discriminatory practices.

I hope this brings light to our position. I get that you disagree with our position but I want you to understand our logic and basis for continuing to seek the loss of all claims listed within the spreadsheet. Finally, kindly take note that we continue to represent other funding companies and we believe that if we litigate, we will be able to blackboard additional losses for other funding companies.

**Akouri & Associates P.L.L.C.**
**18306 Middlebelt Road**
**Livonia, Michigan 48152**
**Phone: (313) 584-1404**

**Tab 6**

**Subject:** RE: Discrimination as to Arabic Amercians & African Amercians
**Date:** Monday, May 18, 2026 at 1:52:00 PM Eastern Daylight Time
**From:** Ryan Bohannon <rbohannon@khvpf.com>
**To:** R Akouri <akouripllc@yahoo.com>, David Groner <david.gronerplc@gmail.com>
**Attachments:** image001.png

Robert,

Following my voicemail, please call me on my cell when you have a moment: 586-215-9426.

On your request for an answer about facilitation by tomorrow—I already informed my client that we have until May 27, and I don't have the ability to get ahold of anyone today. You will have our answer by that date as agreed.

That said, I think a call would serve us better than these emails. My questions do not appear to be coming across the way I intend.

Ryan

---

**From:** R Akouri <akouripllc@yahoo.com>
**Sent:** Monday, May 18, 2026 12:03 PM
**To:** David Groner <david.gronerplc@gmail.com>; Ryan Bohannon <rbohannon@khvpf.com>
**Subject:** Re: Discrimination as to Arabic Amercians & African Amercians

External (akouripllc@yahoo.com)

AWECOMM

Report This Email FAQ Protection by INKY

Ryan:

You asked me to lay out my damages (as what we believe is the basis for discrimination to Arab Americans and African Americans)....now you want me lay out what you would claim as a defense? Your continued new requests are well beyond what was asked of me and my client at the facilitation.

Kindly let me know if we are proceeding forward with a final facilitation or if we are both going forward with other options. I will need your answer by tomorrow morning.

Thank you

**Akouri & Associates P.L.L.C.**
**18306 Middlebelt Road**
**Livonia, Michigan 48152**

**Phone: (313) 584-1404**

On Monday, May 18, 2026 at 11:24:52 AM EDT, Ryan Bohannon <rbohannon@khvpf.com> wrote:

Robert,

Thank you for the clarification. I understand that the spreadsheets reflect the "blanket denial" cases of Arab and Black claimants, and that the four white claimants were provided as comparator evidence. What I am asking about is what has *not* been produced. Specifically:

- Arab and Black claimant cases that Berry managed for the fund that were *not* blanket denials, and
- Non-Arab, non-Black claimant cases that *were* blanket denials.

I assume the specific documents bullet-pointed above exist. If they do not, I need you to clearly tell me that they do not. I intend to inform my client that these categories of documents exist and have not been produced—and that their absence makes it impossible to assess whether any disparity in treatment actually exists across Berry's full book of cases against the Auto Club.

Please let me know by tomorrow whether my assumption is wrong, whether Berry intends to produce this information (*i.e.*, all cases he managed for the fund against the Auto Club regardless of outcome, "blanket denial" status, or claimant race), or whether you have any other information you'd like my client to consider.

Ryan

---

**From:** R Akouri <akouripllc@yahoo.com>
**Sent:** Wednesday, May 13, 2026 6:22 PM
**To:** David Groner <david.gronerplc@gmail.com>; Ryan Bohannon <rbohannon@khvpf.com>
**Subject:** Re: Discrimination as to Arabic Amercians & African Amercians

Ryan:

We were asked to present our measure of damages. The spreadsheets presented to you through mediation were "Blanket Denials" the overwhelming majority of which are either Arab American or African American.

At the facilitation, we were asked to provide proof of discrimination as to claims where we will prove a difference in treatment should an individual not be Arab American or African American. The four names/claims provided were clients of Adam who were not part of either class."

Robert

**Akouri & Associates P.L.L.C.**
**18306 Middlebelt Road**
**Livonia, Michigan 48152**
**Phone: (313) 584-1404**

On Wednesday, May 13, 2026 at 10:06:26 AM EDT, Ryan Bohannon <rbohannon@khvpf.com> wrote:

Robert,

I did not press you on these details at mediation because I understood the spreadsheets to represent the complete universe of cases Berry handled against the Auto Club. My apologies if the miscommunication is my misunderstanding. Berry's subsequent disclosure of four white claimants who appear nowhere in your production is what triggered these questions because it tells me I do not have the full picture.

To brief my client accurately, I need you to confirm my understanding of what has and has not been produced. As I understand it:

- The four spreadsheets contain only Arab and Black claimant cases in which Berry represented the funds and characterizes the cases as "blanket denials"—meaning Arab and Black claimant cases that were *not* "blanket denials" in which Berry represented the fund are absent from the production.

- The four white claimants you disclosed were *not* blanket denials but no other information about non-Arab/non-Black claimant cases were disclosed—meaning there *were* blanket denials of claimants who were not Arab or Black but information about those cases have been withheld.

- In short, what you have given us is a subset of Berry's cases—only the Arab/Black cases he says were blanket denials and four white cases that were not blanket denials, with no corresponding data either way even though it exists.

Please confirm whether my understanding is correct. Also, please advise whether Berry will produce all cases he alleges he managed for a fund against the Auto Club. Without the complete picture across all claimants and all outcomes, there is no way to assess whether any disparity exists at all.

We appreciate having until May 27 to get back to you. If there's any other information you'd like me to share with my client, please let me know by Friday, May 15.

Ryan

---

**From:** R Akouri <akouripllc@yahoo.com>
**Sent:** Tuesday, May 12, 2026 6:32 PM
**To:** David Groner <david.gronerplc@gmail.com>; Ryan Bohannon <rbohannon@khvpf.com>; Akouri & Associates <akouripllc@yahoo.com>
**Subject:** Re: Discrimination as to Arabic Amercians & African Amercians

Ryan:

You are correct, the cases listed on the spreadsheets are the cases which Adam laid out as the "blanket denials". I must confess to you that Adam is getting frustrated as he explained to me that all of the follow up questions you have asked us to address (outside of proof of discrimination-non Arab/African Americans are treated differently) could have been asked at the facilitation. We were told to find proof of disparage treatment and we did as you asked.

Please note that my client has instructed me to drive towards a facilitation in good faith and if we cant get there, we will proceed with litigation. We will give you until May 27 to determine how all parties will proceed.

Thank you,
Robert Akouri

**Akouri & Associates P.L.L.C.**
**18306 Middlebelt Road**
**Livonia, Michigan 48152**
**Phone: (313) 584-1404**

On Tuesday, May 12, 2026 at 03:00:53 PM EDT, Ryan Bohannon <rbohannon@khvpf.com> wrote:

Robert,

Thank you for your response. I need to clarify one point: a search of the spreadsheets you previously produced turns up none of the four white claimants you recently identified. I am therefore left with one of two conclusions—either Berry represented other clients against the Auto Club in connection with claimants beyond those listed on the spreadsheets, or you are representing that the spreadsheets capture every client Berry represented against the Auto Club regardless of race. If the latter, please identify where the four white claimants disclosed appear in your previous production.

Once I have your answer, I will take all of the information you shared back to my client and get you a response on the question of a second mediation. Pulling the right people together this week is difficult, and next week runs into Memorial Day weekend. Please give us until May 27 to respond.

Ryan

**From:** R Akouri <akouripllc@yahoo.com>
**Sent:** Friday, May 8, 2026 4:13 PM
**To:** Ryan Bohannon <rbohannon@khvpf.com>; Akouri & Associates <akouripllc@yahoo.com>; David Groner <david.gronerplc@gmail.com>
**Subject:** Re: Discrimination as to Arabic Amercians & African Amercians

Ryan:

Kindly accept this correspondence as a reply to your last email of May 4, 2026.

My interpretation of your first concern was addressing our legal standing. At the time of the recording with the AAA representative, Adam's firm represented a funding company. The scope of his work encompassed the following: (a) Litigating cases assigned from patients/doctors or the funding company against AAA, (b) If a case was already in litigation by another attorney who already brought a lawsuit [addressing 1st party auto-no fault matters incorporating medical billings which were acquired by the funding company] Adam's firm was responsible for controlling settlement [as to the bills assigned to the fund] and marshaling payments for his client's benefit or (c) any other matters which required representation within Michigan as to the funding company. Under the case of Covenant Med Ctr, Inc. Vs. State Farm Mutual Ins. Co, 500 Mich 191, 895 NW2d 490 (2017), we were granted legal standing to seek and protect the interest of the funding company in Michigan. Our focus of discrimination centers around those cases Adam worked on relative to his client, the fund.

Next, I think you are probing assurances of confidentiality. From my client's side, the recording and the documents reviewed for mediation and potential litigation were circulated amongst: **Adam Berry and myself.** I am aware that independent witness, **Hani Azakir** has knowledge and I presume that his partner, **Mr. Hussein Berri** may also know of some of the facts. From this pool of individuals, both Adam Berry and his team are willing to execute documentation that this information will not circulate; when I spoke to Mr. Hani Azakir (at the time of of his statement under oath 12/06/25) , I asked him not to circulate any information to 3rd parties and he agreed to do so at that time. Mr. Adam Berry's team is prepared, as part of any successful settlement, to execute appropriate confidentiality statements and will affirm the proper destruction of documents. I suggest that at the next meeting, Judge Groner invite Mr. Hani Azakir and confirm that (a) he has not disclosed any information and that (b) he has authority to work a compromise/settlement as it relates to him, his firm and partner.

Finally, you are asking for a breakdown of what Adam believes are either African Amercian or Arab Amercian as it relates to the spreadsheets surrendered by his team. Adam believes that as he was involved with the overwhelming majority of the clients in question, he will affirm that at least 90% of the names listed on the spreadsheets are either African American or Arab American. As to the 4 names presented to bolster our position that discrimination exists as to AAA, Adam did review all 4 individuals's drivers licenses and all 4 were Anglo-saxon; further, the police report also populates such statistical information.

I hope this addresses your concerns and as Judge Groner is in this email chain, I again, would suggest that he reach out to Mr. Hani Azakir and invite him to the next meeting. Per my records, Mr. Azakir's cell number is: 313-312-2188.

Thank you all,
Robert Akouri.

-

On Monday, May 4, 2026 at 04:32:02 PM EDT, Ryan Bohannon <rbohannon@khvpf.com> wrote:

Robert,

Before I present this information to my client, I want to confirm my understanding of Mr. Berry's "fund" representation. Is the theory that Mr. Berry's firm represented funds that held claims assigned by medical providers, who in turn were assigned those claims from insureds or injured parties, who Berry now alleges were victims of discrimination? And for the claims reflected on the four spreadsheets you produced, is Mr. Berry claiming he represented the claimant, the provider, the fund, or some combination of the three? I want to make sure I can articulate the theory accurately before taking it back.

I also want to ensure my report to the Auto Club accurately reflects what you have offered and represented throughout this process. From our first conversation to mediation, you have offered assurances of confidentiality, destruction of the recording, and commitments that the attorneys involved would walk away from similar discrimination-based claims against the Auto Club in the future. You have also represented—despite consistently maintaining that you do not represent Mr. Azakir—that you believe he has kept the recording confidential and that he would be open to negotiating with the Auto Club separately. I want to be clear that none of these have been requests from our side. The Auto Club has neither sought nor encouraged any of them. To the extent we have responded at all, it has been with reservations about whether confidentiality is even achievable in a matter involving allegations of this nature, involving multiple attorneys and law firms who continue to represent clients with first- and third-party claims against the Auto Club. I raise this only so my report to the Auto Club reflects precisely what is being offered, and by whom.

Finally, I want to confirm that the four spreadsheets you previously produced in advance of mediation list only Black and Arab claimants, and that Mr. Berry separately maintains records of similarly situated claimants of other races—including the four white claimants you have now identified. Please confirm whether that is correct.

Once I have your answers, I will brief the Auto Club on the additional allegations you have raised and the proposal you have made and will get back to you promptly with a response on the question of a second mediation.

Ryan

---

**From:** R Akouri <akouripllc@yahoo.com>
**Sent:** Sunday, May 3, 2026 11:51 AM

**To:** David Groner <david.gronerplc@gmail.com>; Ryan Bohannon <rbohannon@khvpf.com>; Akouri & Associates <akouripllc@yahoo.com>
**Subject:** Discrimination as to Arabic Amercians & African Amercians

Genlemen:

Sorry about the delay as I have been bogged down with a trial; last night I asked Mr. Adam Berry to spend 30 minutes to find a quick number of cases with non Arab/African American insureds who were processed quickly as compared to the base of individuals who we believe were discriminated. Within minutes, Adam was able to pull up the 4 claims below; understand that one of several ways of establishing our basis for breach is going to be via zip code breakdown of claims and who is Arab/African Amercian VS Angolsaxon.

In reviewing my 4/3/26 email to everyone, one of our experts, Ms. Beth DeLima believes that (outside of the actual recording we have provided to all parties) one way of supporting evidence of discrimination is to mine claims by zip code/city/region. If we litigate, Mr. Mark St. Peters (our computer/forensic expert) would be tasked mining AAA's claim files to prove the the very discrimination in question.

Again, Ryan asked that we provide proof and below is evidence of at least 4 claims which will support our position as each of the below claims run contrary to what we are experiencing. Our position is that if you are not Arab American or African American, your claims "fly by with ease". Below are 4 claims Adam found with very little effort which his firm was tied to and support the position that AAA discriminates:

1. Kelly Lane; DOL: 12/30/23
Claim #: 401830033
Shiawassee County,

2. Tonya Synr; DOL 12/30/24
Claim #: 402038351
Lenawee County,

3. Jonathan Weymers, DOL 6/18/24
Claim #: PM 11108 (Freemont)
Genesee County

4. Daniel Hardy, DOL 4/11/24
Claim #: 401878708
Wayne County

Upon receipt and review, I ask that Judge Groner call 1 last meeting to determine if we can find a solution. Kindly take note that Ryan wanted assurances that if we settled, he wanted the destruction of all recordings and a confidentiality agreement to be signed by all sides and their attorneys. **Assuming we can work through such a solution, I suggest that Judge Groner also reach out to attorney Hani Azakir as again, he is a witness in my case AND NOT MY CLIENT. I suggest that you ask that he attend, he be placed in his own room and AAA work a signature/release from him directly as I have no intentions of representing him or protecting his interests.**

Thank you,
Robert Akouri

**Akouri & Associates P.L.L.C.**

**18306 Middlebelt Road**
**Livonia, Michigan 48152**
**Phone: (313) 584-1404**