# EXHIBIT 6

Message

**From:** R Akouri [akouripllc@yahoo.com]
**Sent:** 1/4/2026 2:57:08 PM
**To:** Kramer, Michael G. [MGKramer@acg.aaa.com]; Akouri & Associates [akouripllc@yahoo.com]
**Subject:** [EXTERNAL] Discrimination Litigation As to AAA and its affiliates
**Attachments:** Azakir Statement Under Oath.pdf; Recording of Azakir with Adjuster.MOV; Berry Complaint DRAFT.docx

**CAUTION: This Message Is From an Untrusted Sender**

You have not previously corresponded with this sender.
SLOWDOWN, ASSESS, VERIFY, and ACT. Do you know this Sender? Were you expecting this email? If not, report it with your Phishing Button!

Mr. Kramer:

By way of formal introduction, my name is Robert Akouri I am with the firm of Akouri & Associates, PLLC. Please be advised that my firm represents the interest of Mr. Adam Berry relative to allegations of inappropriate company policies and protocols established and promoted by your client(s), AAA and its affiliates.

Per the written statement under oath by attorney Hani Azakir (see below) coupled with the recording of your adjuster, Ms. Delsena Whitty (see below), we believe that there is wides spread discrimination as to Arab Americans and African Americans by AAA, its affiliates, management and staff.

You will also find attached a draft of the complaint based on the recording and the statement under oath.

**At this juncture we are making formal demand for preservation of any and all claims, conversations, recordings, emails, texts and social media wherein attorney Hani Azakir was involved. The same also goes to any and all conversations of adjuster, Delsena Whitty and attorney Hani Azakir.**

**Finally, you will note that as of today, we have not filed the complaint and I have been directed by my client to seek and consider a private facilitation to address his losses. PLEASE NOTE THAT IF WE ARE TO CONSIDER FACILITATION, WE NEED WRITTEN CONFIRMATION THAT YOUR CLIENTS WILL AGREE TO COME TO THE TABLE IN GOOD FAITH AND WILL NEED TO APPOINT A FACILITATOR AS I HAVE A DEADLINE OF FEBRUARY 1, 2026. Should we fail to facilitate and resolve by February 1, 2026 I have been instructed to file my complaint.**

I can be reached via cell at 248-379-3389; if I do not take your call, please leave me a message and I will return your call. Thank you in advance for your anticipated cooperation.

Sincerely,
Robert Akouri

**Akouri & Associates P.L.L.C.**
**18306 Middlebelt Road**
**Livonia, Michigan 48152**
**Phone: (313) 584-1404**

# EXHIBIT 6-A

STATE OF MICHIGAN

IN RE: HANI H. AZAKIR

_____________________________/

ZOOM
DEPONENT: HANI H. AZAKIR P82852 - VTC
DATE: Saturday, December 6, 2023
TIME: 12:04 p.m.
LOCATION: Akouri & Associates, PLLC
18306 Middlebelt Road
Livonia, Michigan
REPORTER: Lory Helland, CER-#3778
Certified Reporter

APPEARANCES:

ROBERT L. AKOURI P43788
Akouri & Associates, PLLC
18306 Middlebelt Road
Livonia, Michigan 48152
313-584-1404
akouripllc@yahoo.com

I N D E X

WITNESS PAGE

HANI H. AZAKIR P82852

Examination by Mr. Akouri 04

E X H I B I T S

NUMBER IDENTIFICATION PAGE

None offered.

Livonia, Michigan
Saturday, December 6, 2023
12:04 p.m.
*     *     *

COURT REPORTER: Before I swear in the deponent, I would like to confirm that all parties agree to allow me to administer the oath to the deponent over the phone. If there is an objection, please state it now.

(No objections.)

H A N I   H.   A Z A K I R

having been first duly sworn, was examined and testified as follows:

E X A M I N A T I O N

BY MR. AKOURI:

Q. Sir, for the record, can we have your full name?
A. Hani Haissam Azakir.
Q. Mr. Azakir, you understand you're giving a voluntary statement under oath?
A. I do.
Q. You understand that you are obliged to tell the truth, correct?
A. Correct.
Q. You understand that this is a recorded statement, you've been sworn under oath, and if it's determined

down the road that you are lying somewhere, this could be used against you as perjury?
A. I do.
Q. Okay.
What is your occupation, sir?
A. I'm an attorney.
Q. What is your business address?
A. Business address is 835 Mason Street, Suite A310, Dearborn, Michigan 48124.
Q. Sir, you've given a deposition -- you've been in depositions before, correct?
A. That's correct.
Q. So do you mind if I just go over some ground rules for you?
A. Sure thing.
Q. Thank you, because I want to make sure it's preserved on the record.
MR. AKOURI: Please allow the question to be asked in its entirety before you answer the question.
Is that fair?
WITNESS: Understood.
MR. AKOURI: Even though you think you understand the question midstream, and human nature is that we talk over people, I need this record crisp and

clear.
Is that fair?
WITNESS: That's fair.
MR. AKOURI: Secondly -- the other reason why is the court reporter can only take down one voice at a time, so if you allow it so that one voice happens at a time, she can write a better record.
Is that fair?
WITNESS: That's fair.
MR. AKOURI: I need you to stop me if you don't understand the question asked of you.
WITNESS: Understood.
MR. AKOURI: If you stop me, ask me to explain it in a different fashion so that you understand it.
WITNESS: Understood.
MR. AKOURI: If you don't understand it, do not answer the question.
WITNESS: Understood.
MR. AKOURI: If you answer the question, is it fair for me to assume that you understood the question asked of you?
WITNESS: It is.
MR. AKOURI: Fair. Fair.
BY MR. AKOURI:

Q. You've given us your business address.
We've met before in passing, haven't we?
A. We have.
Q. In fact, I've worked with your partner on a case where both of us were co-counsel on a case, correct?
A. I don't know much about that case, but based on my limited understanding, you two did work together.
Q. And didn't he tell you how great lawyer I was?
A. Yes.
Q. It's on the record now. You know, you can't lie, so that's important.
A. That's right.
Q. So other than that one case with your partner, you and I have been saying hello, has there been any other involvement with each other?
A. No.
Q. Please forgive some of these personal questions because they are crucial in understanding what this claim is all about.
You are Arab American, correct, sir?
A. That's correct.
Q. What is your religion?
A. I'm Muslim.
Q. And do you think that the fact that I'm asking about your religion is a variable that might be important to

address today's issues?
A. Yes.
Q. Okay.
Have you ever had contact with AAA?
A. On numerous occasions.
Q. You know what AAA is, it's the American Auto -- I don't know -- is it American Auto Club Insurance Company? I think that's the name of it?
AAA, you know AAA.
A. I know AAA. I don't know whether or not that's what it stands for, but yes.
Q. How have you dealt with AAA?
A. In my capacity as a plaintiff's attorney representing various injured parties.
Q. So in Michigan, there are what are called first-party and third-party lawsuits as it relates to auto insurance claims.
Do you know what first-party claims are?
A. I do.
Q. Do you know what third-party claims are?
A. I do.
Q. In Michigan when it comes property, there are premises liability claims.
Do you know what those are?
A. I do.

Q. And the work that you do, does it encompass all of that sort of work?
A. It does, but mainly first and third party, but we certainly do -- my firm does handle premises claims as well.
Q. Okay.
Your firm, on a percentage basis, how much of it is doing first-party work?
A. First and third party, I would say it's 95 percent of what we do.
Q. Okay.
These are also crucial questions for you, sir, because I want to make sure I'm trying to get objectivity out of you.
In giving testimony today under oath, are you expecting any (zoom audio dropped) special gain from the -- out of this case?
A. No.
Q. Are you getting a referral fee from me or my firm as it relates to this matter?
A. No.
Q. Is your firm getting a referral fee from me or my firm as it relates to this matter?
A. No.
Q. You have a partner, right?

A. I do.
Q. Have you had this discussion with your partner about why I need your testimony?
A. Yes.
Q. Have you and your partner conferred with each other and are both of you walking away from any referral fee from me or my firm?
A. Yes.
Q. Why are you here testifying today?
A. Well, various reasons, but, you know, I was just -- the more I think about why we're here, and this is something that was re-affirmed by Adam Berry, the more I really, you know, just come to the conclusion that AAA's behavior is absolutely outrageous.
Q. And in what way do you believe it's outrageous?
A. It's discriminatory as to my own culture, to African Americans, and to various other cultures as well.
Q. Historically, do you have any theory regarding claims and payments on claims?
A. How do you mean by that?
Q. Okay.
Do you have a -- do you have a belief or an opinion as to how AAA takes in money?
A. Yeah, yeah. I mean, I -- so just to kind of preface my answer, so I did spend a large portion of my career

as an insurance defense attorney, so I would -- not that I understand exactly how the business aspect of AAA works, but I can almost certainly agree and confirm that AAA takes money in all sorts. And they're absolutely colorblind when it comes to taking money.

But when it comes to paying out claims, my personal belief is that they do so based on color, culture and religion.

So, for instance, if you're Anglo-Saxon or of Christian descent, you're more likely to get a larger payout, the claim is likely less scrutinized by claims-handling individuals, and you're more likely to get paid more efficiently. As opposed to an Arab or, you know, Arab American, a Muslim, an African American or any other culture that is not Anglo-Saxon, you're generally more subject to a bigger fight. The claims are generally handled more aggressively by claims-handling individuals and the payouts are significantly less.

Q. So if they're significantly less as compared to Anglo-Saxons or Christians, is it fair to say that AAA is keeping most of their money in their coffers?

A. Absolutely.

Q. As it relates to those other minorities, be it Arab

Americans, Muslims or African Americans?
A. Absolutely.
Q. What's your basis that you believe that AAA treats clients differently based on race, religion or skin culture?
A. So it's based on numerous conversations that I had with a certain AAA adjustor.
Q. Who is that adjustor?
A. Her name is Delsena Whitty.
Q. What did Delsena Whitty tell you?
A. So --
Q. Let me rephrase it.
Let's go about this in a different way.
How do you know the adjustor, Delsena Whitty?
A. So Delsena was a bodily injury adjustor assigned to a claim my firm was handling and, specifically, she was handling the third party aspect of the claim.
For context, that claim involved our client who was involved in a very significant motorcycle accident where he was admitted to the hospital for almost a month. He had various broken bones, he was on the verge of death. As I said, very significant claim.
The policy of the at-fault driver, who was

insured by AAA, was very nominal in relation to the injuries that he sustained. It was, based on my recollection, 100,000.

And shortly after receiving the medical records from the hospital, we presented AAA with a demand. We opened up a claim, my firm did, and presented AAA for a demand for resolution, and requested that the $100,000 policy limit be tendered. And that individual who I was speaking with throughout that process was Delsena Whitty.

Q. Okay.

During that conversation, did you ever have discussions about how AAA treats claimants differently based on culture or religion or skin culture -- skin color, not culture.

A. Yes. Yes.

Not initially, but eventually, you know, those conversations did arise.

Q. Step back for a second.

When did that conversation occur? Approximately, winter, spring, summer, fall, and what year?

A. The initial conversation I believe happened in September of 2024.

Q. Another important question: Was this made through a

AAA claim number?
A. Yes.
Q. So it wasn't Ms. Delsena Whitty's personal cell phone, it would be a company line that belongs to AAA, correct?
A. Certainly, yes.
Q. Tell us about that conversation you had with her.
A. So it was -- that initial conversation was me just calling following up on the status of the claim.
Again, this was in September. I believe the accident together with the demand had been presented months prior. And so, you know, surprise as to why it was taking so long for Delsena to make a decision as to the tendering of the nominal policy in relation to the accident, you know, the conversation was, you know, essentially had.
And I would also like to note that Delsena and I had spoken on numerous occasions, so we had grown some sort of rapport.
In response to my question as to what was taking her so long as to the tendering of the policy, she admitted that AAA staff, AAA claims handlers, generally, whether it be first or third party claims folks, were severely overworked and understaffed and lacked the capabilities of expeditiously resolving

claims.

Not recalling specifically how the context of this specific conversation arose, but she referenced that she believed that race and ethnic background and religion played a very large part in how claims are adjudicated on a pre-litigation basis.

She affirmed that, you know, there's, you know, conversations, perhaps, from higher-ups at AAA that directly impose restrictions on an adjustor's ability to adjudicate a claim expeditiously and impose restrictions more or less on the basis of race, religion, ethnic background.

So -- and she, as well, referenced a specific claim in the -- kind of driving in the point that, you know, these behaviors happen on a large scale at AAA and presumably at other affiliated insurers with AAA.

She gave an example of a claim that she had heard of or was otherwise adjusting personally involving the life of a prominent white Caucasian American lawyer who had been involved in an accident and sustained a very minor ankle fracture.

She referenced that higher-ups at AAA were considering and were very likely going to tender a million-dollar policy in relation to that accident.

And she found that to be absolutely absurd. And she mentioned that, you know, had the same injuries been sustained by an African American or anybody else outside of, you know, Caucasian culture or race, for that matter, that, you know, doing so would be absolutely not in consideration.

Q. I want you to step back for one quick second, because you had mentioned a couple of times over that this claim was a nominal claim, correct?

You called it a "nominal claim" several times when we talked about this motor vehicle/motorcycle accident with a fractured leg.

A. So it was a nominal claim in relation to the actual injuries.

Q. So let me ask this: How many years have you been practicing doing third party and first party?

A. Almost eight years now.

Q. Do you recall if the injury in that motorcycle accident was a fracture with open reduction and internal fixation, plates, screws, anything like that in that ankle?

A. Oh, certainly, yes.

Q. So is it your professional opinion that the $100,000 that was being offered was far below what the true value of the injury was?

A. Certainly it's -- it was, in my opinion, nice to evaluate claims on a third party side, when I was a defense attorney, so various different insurers, that claim would have evaluated for purposes of resolution on a seven-figure basis.

Q. So when you tell us a "nominal claim," it's your professional opinion that these injuries far exceeded the 100,000, "Where is the doggone money? Why haven't you paid?", is that what you were trying to explain during your testimony?

A. Yes.

Q. Okay.

(Off the record at 12:18 p.m.)

(Back on the record at 12:18 p.m.)

BY MR. AKOURI:

Q. So you had indicated earlier that in that motorcycle accident/motor vehicle accident, fractured leg, open reduction, internal fixation, plates and screws, and that it was your professional opinion, based on giving assessments to other claimants when you were doing defense work, that it was your opinion that these injuries far exceeded the $100,000 policy, correct?

A. Correct.

Q. So is that when you keep calling it a "nominal claim," is that the reason you call it a "nominal claim"?

A. Correct.
Q. Okay.
And I think you also testified that you were frustrated in the delay on payout on this nominal claim?
A. Certainly, yes.
Q. And forgive me for leading you, and I know I'm allowed to lead you, but I'm really trying to get your own information out. I was concerned -- I think our court reporter accidently shut off the recording device.
COURT REPORTER: No, actually I lost you. My internet went down, so...
MR. AKOURI: So tell us when you're ready, and we'll continue then.
COURT REPORTER: I'm ready.
BY MR. AKOURI:
Q. So let's go back to this next line of questioning.
Did you record the initial conversation?
A. I didn't.
Q. Why not?
A. So it was -- honestly, I didn't -- it was kind of thrown at me.
Q. Sure.
A. I never thought in a million years that I would hear such incriminating statements from any adjustor, and I

was absolutely shocked and surprised by what she said.
Q. Did you ever think to record or preserve that conversation?
A. Not once, no.
Q. So after that initial call, what happened next?
A. So I kind of just sat back and just kind of thought about what the heck just happened and what I heard.
Q. Right.
A. And, you know, shortly thereafter went down the hall to use the bathroom.
Q. So is your bathroom in your office?
A. No. It's a shared bathroom in our building.
Q. So it's a public bathroom down the hall?
A. Correct.
Q. Who has access to that bathroom?
A. Any and all tenants or invitees of the building.
Q. So when you walked to the bathroom, did you see a tenant or an invitee in the bathroom?
A. I did, yes.
Q. Who was that?
A. Adam Berry.
Q. Do you know Adam Berry?
A. I do.
Q. Is he related to you?
A. He is not.

Q. How do you know Adam Berry?
A. So Adam Berry is a lawyer and he practices -- it's a small firm, it's right down the hall from my law firm.
Q. Would you call Adam a friend?
A. Yeah.
Q. So what did you guys discuss?
A. So -- actually, funny, we were -- I was on one urinal, and he was on the urinal directly next to me. And, you know, I was still -- the conversation was still fresh in my mind. You know, the shock was still -- I mean, I was still shocked by what I heard.
So, you know, I told him, "You're not going to believe what I just heard from a AAA adjustor." And I told him that, you know, she admitted that the protocols at AAA, and this was affirmed by higher-ups, and it was wide, you know, and accepted behavior, that the protocols were racist. That they, you know, adjudicated or, you know, handle claims on the basis of race, religion, ethnic background. And I was essentially just venting to Adam.
Q. Did you think to go back and record the adjustor after that?
A. No, I didn't.
Q. So did you record the conversation?
A. I did.

So Adam suggested that I call back and record the conversation really just because he didn't believe me.

Q. Okay.

Do you know why -- I guess, do you know why Adam suggested that you record the conversation?

A. Yes. So initially he thought I was full of shit --

Q. Okay.

A. -- and that I was making things up.

So, honestly, I just wanted to prove to him that that conversation actually happened, and the things that I noted to him in the bathroom were actually said.

Q. And did you reach back out to the adjustor after that?

A. I did.

Q. Was that on the same day?

A. It was not.

Q. How many days apart?

A. I don't recall. It may have been a week. I'm not entirely sure at this point.

Q. So just to keep things in context, you have this conversation with this adjustor. After this conversation, you walk down the hall, you go to the bathroom.

You tell Adam. Adam says, "You know what,

I don't believe you, go record it, go get a recording?"

And then several days later or not the same day, you record -- I have a follow-up conversation?

A. Correct.

Q. Do you remember how many days apart?

A. It was days, if not weeks apart.

Q. During the second conversation, did you record?

A. I did.

Q. Did you let her know you were talking to her and you're recording her?

A. No.

Q. What did you guys talk about?

A. So we talked about -- again, I believe we talked about the claim, the claim that my firm was handling.

Q. Sure.

A. You know, I inquired as to, again, what the status was, when payment was expected to be made on the claim. And we may have talked about a recent 60 Minute episode where adjustors in Florida were, you know, in large kind of walking out and whistleblowing, you know, illegal and arbitrary practices by insurers as it pertains to home insurance claims in Florida.

And the conversation essentially -- the conversation that she referenced as it pertains to

AAA's internal policies being raciest, divisive, you know, predicated wholly on race, ethnic background, religion were brought up again.
Q. And did you give focus to the conversation about behavior in Michigan or is this -- when you're saying that this adjustor spoke to you, was she talking about a broadcast throughout the nation or did you guys -- were you able to get focus that you were talking about behavior in Michigan?
A. So she -- she -- I believe she referenced that the behavior, you know, specifically as, you know -- and by that I mean the protocol at AAA, the arbitrary and illegal and racist protocols at AAA were far-reaching. But she also specified that it certainly does happen in Michigan.
Q. Okay.
A. And I can -- based on my recollection, she specifically -- you know, affirmed that, you know -- she affirmed that absolutely race has something to do with how claims are handled in Michigan.
She absolutely, based on my recollection, affirmed that, you know, skin color, religion, ethnic background has a lot to do with how claims are handled in Michigan.
She specifically referenced being taken

aback when, you know, in roundtable meetings with supervisors and higher-ups at AAA, they make comments that, "Hey, you know, this claim shouldn't be paid" or "This claim should be denied, because this claim is in Dearborn" or "This claim is from Detroit" or "This claim is from Hamtramck."
Q. What did you understand that to mean when an adjustor tells you, "This claim is in Dearborn, Detroit or Hamtramck"?
A. Well, Dearborn has a vary large Muslim, Arab American population. So by that, she meant that if the claim was -- if a claimant was Arab American, Muslim, or non-Caucasian that their claim would be, you know, subject to a higher and more arbitrary racist standard of claims handling than a white Caucasian claim.
Q. And how about as to Detroit and as to Hamtramck? Is your testimony consistent with what you just described as to the Dearborn City?
A. Correct. The exception, obviously, that Detroit has a large African American and black population.
Q. Okay.
Did you preserve that recording?
A. I did.
Q. Do you have still have that recording?
A. I do.

Q. I would ask that you keep that preserved and hold on to it for now, and at some point in time I'm going to need a copy of that.
Is that fair?
A. That's fair.
Q. Following that recording, did go back to Adam and say, "Hey, here's proof." What did you do?
A. Yes. So I did. I spoke to Adam, and I told him, "Here you go", right?
So like, "I'm not lying, but here's the proof. She affirmed exactly what I was telling you in the bathroom." And he was absolutely shocked. He couldn't believe it.
Q. Did there come a time where Adam came back to you and said, "I've done some math here looking at all of my claims, and if what you're saying is true and what those recordings say is true, there's substantial losses" based on claims that he should have been getting higher pay on?
A. Yes, yes.
So he referenced that his firm over the years had handled thousands, perhaps, of claims, which involve claimants of African American or black descent, who were of Arab American descent or of any kind of culture, religion, culture or ethnic

background that is not white or religion that is not Anglo-Saxon Christian, and that he believed that those claims were unfairly adjudicated by AAA. That they were paid on a lesser value. That his firm has lost potentially millions of dollars in potential settlements, and that his clients, in large, were aggrieved.

Q. Adam expressed to you that he took 33 and a third of every one of those cases, right?

A. Correct.

And he did -- you know, he did explain that that money would come in regardless, so he wouldn't have to file a suit on a case for him to get his third. Whenever he gets retained, if claims are being paid as they should on a pre-litigation basis --

Q. Right.

A. -- then his firm would get a third regardless.

Q. Right.

A. He also explained that when a claim gets denied, he has to push that claim into litigation, which obviously involves the -- you know, it involves costs, filing fees, etcetera, the retention of employees, attorneys, staff and things of the like.

Q. And if, in fact, this equation or this behavior by AAA were, in fact, true, if Adam is taking 33 and a third,

and the settlement is a lesser settlement, his 33 and a third would be less too, wouldn't it?
A. Correct.
And based on what he told me, he was -- based on these, you know, arbitrary and racial denials, he was forced to higher addition employees and incur unnecessary costs.
Q. Okay.
Is there anything else you want to point out to me? Or do you feel that you've been pretty straightforward?
A. I feel like I've been pretty straightforward. Nothing further at this point.
MR. AKOURI: Thank you.
Madam Court Reporter.
COURT REPORTER: Yes.
MR. AKOURI: I'm going to get a copy of that transcript in writing.
COURT REPORTER: And 10 business days is good for you?
MR. AKOURI: Yes. No rush, no rush.
COURT REPORTER: Real good.
(EUO concluded at 12:31 p.m.)
- - -

Certificate of Notary Public

I certify that this transcript is a complete, true, and correct record of the testimony of the witness held in this case.

I also certify that prior to taking this EUO, the witness was duly sworn or affirmed to tell the truth.

I further certify that I am not a relative or an employee of or an attorney for a party; and that I am not financially interested, directly or indirectly, in the matter.

In witness whereof, I have hereunto set my hand this 10th day of December, 2025.

LORY A. HELLAND, CER-#3778
Notary Public, Fairfield County, Ohio
My Commission Expires: 10/22/2030

# EXHIBIT 6-B

**(media file)**

# EXHIBIT 6-C

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

**ADAM BERRY,** Case No.

Plaintiff, Hon.:

VS.

**AUTOMOBILE CLUB INSURANCE ASSOCIATION (AAA),**

Defendant.

_______________________________________/

**AKOURI & ASSOCIATES, PLLC**
By: Robert Akouri (P-43788)
18306 Middlebelt Rd.
Livonia, MI 48152
(313) 584-1404
akouripllc@yahoo.com

_______________________________________/

THERE ARE NO CURRENT OR PENDING CASES
IN THIS COURT OF JURISDICTION OR ANY OTHER
COURT OF JURISDICITON GROWING OUT
THE SAME TRANSACTION OR OCCURANCE
***/S/ROBERT AKOURI*** **(P-43788)**

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

NOW COMES PLAINTIFF, ADAM BERRY, by and through his retained counsel, Akouri & Associates, PLLC and for its complaint against Defendant, states as follows:

1. Plaintiff, Adam Berry ("Plaintiff") is an attorney licensed to practice law in the State of Michigan, maintaining a law office in Dearborn, Michigan. Plaintiff operates a law firm that represents clients in personal injury matters, including first-party no-fault insurance claims and third-party automobile negligence claims.

2. Defendant Automobile Club Insurance Association ("AAA" or "Defendant") is an insurance company authorized to do business in the State of Michigan, providing automobile insurance coverage including personal injury protection (PIP) benefits and third-party liability coverage.

3. This Court has jurisdiction over this matter pursuant to MCL 600.605, as the amount in controversy exceeds $25,000.00.

4. Venue is proper in Wayne County pursuant to MCR 2.117 and MCL 600.1629, as Defendant conducts substantial business in Wayne County and a substantial part of the events giving rise to this action occurred in Wayne County.

5. Plaintiff represents clients in personal injury matters arising from automobile accidents, including first-party PIP claims and third-party liability claims. Plaintiff is compensated through contingency fee agreements with his clients, typically receiving one-third (33⅓%) of any recovery.

6. Over the course of his practice, Plaintiff has represented thousands of clients, many of whom are Arab American, Muslim, and African American individuals residing in communities including Dearborn, Detroit, and Hamtramck.

7. Plaintiff has submitted numerous claims to Defendant on behalf of his clients for payment of medical expenses, lost wages, attendant care, and other benefits required under Michigan's No-Fault Act, as well as third-party liability claims for pain and suffering, scarring, and other damages.

8. Upon information and belief, Defendant has implemented and maintained discriminatory claims-handling policies, practices, and protocols that systematically result in the

underpayment, delay, and wrongful denial of insurance claims submitted by or on behalf of Arab American, Muslim, and African American claimants.

9. On or about September 2024, Hani H. Azakir, an attorney practicing personal injury law in Michigan, was handling a third-party liability claim on behalf of a client who sustained severe injuries in a motorcycle accident, including a leg fracture requiring open reduction and internal fixation with plates and screws, and hospitalization for approximately one month.

10. The at-fault driver in that accident was insured by Defendant with a policy limit of $100,000.00.

11. Mr. Azakir's firm presented a demand to Defendant for payment of the $100,000.00 policy limit. The claim was assigned to Defendant's bodily injury adjuster, Delsena Whitty.

12. During telephone conversations between Mr. Azakir and Ms. Whitty conducted on AAA business telephone lines in September 2024 and in subsequent weeks, Ms. Whitty made extraordinary admissions regarding Defendant's claims-handling practices.

13. Ms. Whitty admitted to Mr. Azakir that race, ethnic background, and religion play "a very large part in how claims are adjudicated on a pre-litigation basis" at AAA.

14. Ms. Whitty stated that "higher-ups at AAA" directly impose restrictions on adjusters' ability to adjudicate claims expeditiously and that these restrictions are imposed "more or less on the basis of race, religion, ethnic background."

15. Ms. Whitty affirmed that "race has something to do with how claims are handled in Michigan" and that "skin color, religion, ethnic background has a lot to do with how claims are handled in Michigan."

16. Ms. Whitty specifically referenced that in roundtable meetings with supervisors and higher-ups at AAA, comments are made such as "this claim shouldn't be paid" or "this claim should be denied, because this claim is in Dearborn" or "this claim is from Detroit" or "this claim is from Hamtramck."
17. Dearborn, Michigan has a large Arab American and Muslim population. Detroit and Hamtramck have large African American and Black populations.
18. Ms. Whitty provided a specific example of discriminatory treatment: she stated that AAA higher-ups were considering tendering a million-dollar policy limit for a prominent white Caucasian American lawyer who sustained only a minor ankle fracture, while comparable or more severe injuries sustained by African American or non-Caucasian claimants would not receive such consideration.
19. Ms. Whitty affirmed that if the same injuries were "sustained by an African American or anybody else outside of, you know, Caucasian culture or race," that paying comparable amounts "would be absolutely not in consideration."
20. Following his initial conversation with Ms. Whitty, Mr. Azakir encountered Adam Berry (Plaintiff herein) in a shared bathroom facility in their office building.
21. Mr. Azakir informed Plaintiff of Ms. Whitty's admissions. Plaintiff initially expressed disbelief at such statements.
22. At Plaintiff's suggestion, Mr. Azakir placed a follow-up telephone call to Ms. Whitty days or weeks later and recorded the conversation.
23. During that recorded conversation, Ms. Whitty reaffirmed her prior statements regarding AAA's discriminatory claims-handling practices based on race, ethnic background, and religion, and specifically confirmed such practices occur in Michigan.

24. Mr. Azakir has preserved this recording and provided sworn testimony regarding these conversations in a statement under oath taken on December 6, 2023 (erroneously dated 2023, actually 2024).

25. Upon learning of these admissions and reviewing his own case files, Plaintiff conducted an analysis of claims he had submitted to Defendant over the years on behalf of Arab American, Muslim, and African American clients.

26. Plaintiff determined that claims submitted on behalf of Arab American, Muslim, and African American clients were systematically undervalued, subjected to excessive delays, and denied at rates far exceeding comparable claims involving white or Caucasian claimants.

27. These claims were otherwise medically and legally justified and comparable to claims submitted for non-minority claimants that were paid in full or at significantly higher values.

28. As a direct result of Defendant's discriminatory claims-handling practices, Plaintiff's clients received substantially reduced settlements or were wrongfully denied benefits entirely.

29. Because Plaintiff's compensation is contingent upon recovery for his clients (typically one-third of the settlement or judgment), Defendant's discriminatory underpayment of claims has directly reduced Plaintiff's fee income by millions of dollars.

30. Additionally, Defendant's discriminatory denials have forced Plaintiff to file lawsuits and pursue litigation on claims that should have been paid on a pre-litigation basis, requiring Plaintiff to incur substantial additional costs including filing fees, court costs, expert witness fees, and increased staffing expenses.

31. Plaintiff has been forced to hire additional employees, attorneys, and staff to handle the increased litigation burden caused by Defendant's systematic discriminatory denials.
32. Defendant's conduct constitutes a pattern and practice of intentional racial, ethnic, and religious discrimination that is pervasive, willful, and malicious.
33. Defendant's discriminatory practices have no legitimate business justification and violate clearly established Michigan and federal civil rights laws.

**COUNT I VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT (MCL 37.2101 et seq.)**

34. Plaintiff incorporates by reference all prior paragraphs as though fully stated herein.
35. The Elliott-Larsen Civil Rights Act ("ELCRA"), MCL 37.2101 et seq., prohibits discrimination in places of public accommodation and in the provision of goods and services based on race, color, religion, or national origin.
36. MCL 37.2302(a) provides that a person shall not "deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status."
37. Insurance companies providing services to the public constitute places of public accommodation within the meaning of ELCRA.
38. Defendant has systematically denied full and equal treatment to claimants based on their race, national origin, and religion.

39. By implementing and maintaining policies and practices that result in reduced payments, increased delays, and wrongful denials of claims submitted by Arab American, Muslim, and African American claimants, Defendant has violated ELCRA.

40. Plaintiff has suffered concrete, particularized, and actual injury as a direct result of Defendant's discriminatory practices, including substantial lost fee income and increased operating expenses.

41. As an attorney representing clients whose claims were subjected to discriminatory treatment, and as the contractual beneficiary entitled to a percentage of claim recoveries, Plaintiff has standing to assert ELCRA violations that directly injured his business interests.

42. Michigan courts recognize standing where a plaintiff suffers "concrete and particularized injury" that is "actual or imminent." *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 372 (2010).

43. Defendant's conduct was willful, malicious, and in reckless disregard of Plaintiff's rights.

44. Plaintiff is entitled to compensatory damages, exemplary damages, costs, and attorney fees pursuant to MCL 37.2802.

## COUNT II TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

45. Plaintiff incorporates by reference all prior paragraphs as though fully stated herein.

46. Plaintiff had valid business expectancies in the form of legal representation agreements with clients who submitted claims to Defendant for payment of no-fault benefits and third-party liability claims.

47. Under these representation agreements, Plaintiff had a reasonable expectation of receiving one-third of any settlement or recovery obtained on behalf of his clients.

48. Defendant had knowledge of Plaintiff's business expectancies, as Plaintiff identified himself as counsel of record in correspondence and communications with Defendant regarding his clients' claims.

49. Defendant intentionally interfered with Plaintiff's business expectancies by implementing and maintaining discriminatory claims-handling practices designed to reduce or deny payments to Arab American, Muslim, and African American claimants.

50. Defendant's interference was intentional and improper, lacking any legitimate business justification.

51. Defendant's interference was motivated by racial, ethnic, and religious bias and discriminatory animus.

52. As a direct and proximate result of Defendant's tortious interference, Plaintiff suffered substantial lost fee income, as his clients received reduced settlements or no recovery at all.

53. Plaintiff is entitled to compensatory damages for lost profits and income, as well as consequential damages.

**COUNT III FRAUDULENT MISREPRESENTATION**

54. Plaintiff incorporates by reference all prior paragraphs as though fully stated herein.

55. Defendant knowingly and intentionally misrepresented the basis for its claim denials and reduced settlement offers to Plaintiff and his clients.

56. Specifically, Defendant represented that claims were denied or reduced based on legitimate factors such as medical necessity, causation, policy limits, or liability disputes.

57. In fact, as admitted by Defendant's own adjuster, the true basis for claim denials and reductions was the race, ethnicity, and religion of the claimants.

58. Defendant made these misrepresentations with knowledge of their falsity and with the intent that Plaintiff and his clients rely upon them.

59. Defendant concealed its true discriminatory claims-handling practices from Plaintiff, his clients, medical providers, courts, and regulatory authorities.

60. Plaintiff reasonably relied upon Defendant's representations regarding the bases for claim denials and reduced offers when advising his clients and evaluating settlement options.

61. As a direct and proximate result of Defendant's fraudulent misrepresentations and concealment, Plaintiff suffered substantial damages including lost fee income, increased litigation costs, and additional staffing expenses.

62. Defendant's fraudulent conduct was willful, malicious, and in reckless disregard of Plaintiff's rights.

63. Plaintiff is entitled to compensatory damages, consequential damages, and exemplary damages.

**COUNT IV CIVIL CONSPIRACY**

64. Plaintiff incorporates by reference all prior paragraphs as though fully stated herein.

65. Upon information and belief, Defendant's discriminatory claims-handling practices were implemented and maintained through the coordinated actions of multiple employees, supervisors, and higher-level management personnel.

66. These individuals, acting within the scope of their employment and authority, conspired and agreed to unlawfully discriminate against Arab American, Muslim, and African American claimants in the evaluation and payment of insurance claims.
67. The conspiracy involved regular roundtable meetings where supervisors and higher-ups directed adjusters to deny or reduce claims based on geographic location (Dearborn, Detroit, Hamtramck) as a proxy for race, ethnicity, and religion.
68. The conspiracy involved the implementation of internal directives and protocols that systematically disadvantaged minority claimants.
69. The conspiracy was formed for the unlawful purpose of reducing claim payments based on discriminatory criteria in violation of Michigan and federal civil rights laws.
70. Overt acts in furtherance of the conspiracy included: (a) issuing directives to adjusters to scrutinize claims more heavily based on claimant race or geography; (b) reducing settlement offers on claims involving minority claimants; (c) wrongfully denying legitimate claims; (d) imposing artificial delays on claim processing; and (e) concealing the discriminatory basis for claim decisions from claimants, attorneys, and regulators.
71. As a direct and proximate result of this civil conspiracy, Plaintiff suffered substantial damages including lost fee income and increased operating expenses.
72. Plaintiff is entitled to compensatory and exemplary damages.

**COUNT V VIOLATION OF MICHIGAN CONSUMER PROTECTION ACT (MCL 445.901 et seq.)**

73. Plaintiff incorporates by reference all prior paragraphs as though fully stated herein.

74. The Michigan Consumer Protection Act ("MCPA"), MCL 445.901 et seq., prohibits unfair, unconscionable, and deceptive business practices in trade or commerce.

75. MCL 445.903(1) prohibits unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce.

76. Defendant's discriminatory claims-handling practices constitute unfair, unconscionable, and deceptive acts in violation of the MCPA.

77. Specifically, Defendant engaged in deceptive practices by misrepresenting the bases for claim denials while concealing its true discriminatory motives.

78. Defendant's conduct is unconscionable in that it systematically exploits and disadvantages vulnerable minority claimants who have suffered injuries and are entitled to insurance benefits.

79. Defendant's conduct violates public policy, as discrimination based on race, ethnicity, and religion is expressly prohibited by Michigan and federal law.

80. Plaintiff suffered ascertainable loss as a direct result of Defendant's violations of the MCPA.

81. Plaintiff is entitled to actual damages, costs, and attorney fees pursuant to MCL 445.911.

**COUNT VI VIOLATION OF MICHIGAN'S UNFAIR TRADE PRACTICES ACT (MCL 500.2001 et seq.)**

82. Plaintiff incorporates by reference all prior paragraphs as though fully stated herein.

83. MCL 500.2026 prohibits unfair claim settlement practices, including:

    - (a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

- (b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims;
- (c) Failing to adopt and implement reasonable standards for the prompt investigation of claims;
- (d) Refusing to pay claims without conducting a reasonable investigation;
- (e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
- (f) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims;
- (g) Compelling insureds to institute litigation to recover amounts due by offering substantially less than amounts ultimately recovered.

84. Defendant's discriminatory claims-handling practices constitute multiple violations of MCL 500.2026, including but not limited to subsections (a), (d), (f), and (g).

85. Using race, ethnicity, religion, or geographic location as criteria for claim evaluation and payment constitutes an unfair and arbitrary claim settlement practice.

86. These practices have no actuarial justification and are illegal under state and federal civil rights laws.

87. While certain provisions of MCL 500.2001 et seq. do not provide an independent private right of action, Defendant's violations support Plaintiff's other claims and demonstrate the systematic and unlawful nature of Defendant's conduct.

88. Plaintiff is entitled to damages and injunctive relief.

**COUNT VII BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

89. Plaintiff incorporates by reference all prior paragraphs as though fully stated herein.
90. Insurance policies issued by Defendant contain an implied covenant of good faith and fair dealing.
91. This covenant requires Defendant to act fairly and in good faith in evaluating and paying claims submitted under its policies.
92. Defendant breached the implied covenant of good faith and fair dealing by implementing discriminatory claims-handling practices that systematically disadvantaged Arab American, Muslim, and African American claimants.
93. Defendant's conduct was in bad faith, as it was motivated by discriminatory animus rather than legitimate business or actuarial considerations.
94. Defendant's discriminatory conduct undermines the fundamental intent and purpose of insurance contracts, which is to provide fair compensation for covered losses.
95. As assignee of benefits under numerous insurance policies, and as the contractual beneficiary of representation agreements with insureds, Plaintiff has standing to assert breach of the implied covenant.
96. As a direct and proximate result of Defendant's breach, Plaintiff suffered substantial damages including lost fee income.
97. Plaintiff is entitled to compensatory damages.

**COUNT VIII VIOLATION OF 42 U.S.C. § 1981**

98. Plaintiff incorporates by reference all prior paragraphs as though fully stated herein.
99. 42 U.S.C. § 1981 provides that all persons shall have the same right to make and enforce contracts as is enjoyed by white citizens.

100. This statute prohibits racial discrimination in the making, performance, modification, and termination of contracts.

101. Insurance policies and settlement agreements constitute contracts within the meaning of § 1981.

102. Defendant intentionally discriminated against Arab American and African American claimants in the performance and enforcement of insurance contracts by systematically reducing payments and denying claims based on race and national origin.

103. Defendant's conduct deprived Plaintiff's clients of their rights to make and enforce contracts on the same terms as white citizens.

104. As the attorney representing these clients under contingency fee agreements, and as assignee of certain contract rights, Plaintiff has standing to assert violations that directly injured his financial interests.

105. Plaintiff has suffered substantial economic injury as a direct result of Defendant's violations of § 1981.

106. Defendant's conduct was intentional, willful, malicious, and in reckless disregard of Plaintiff's and his clients' federal civil rights.

107. Plaintiff is entitled to compensatory damages, punitive damages, costs, and attorney fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff Adam Berry respectfully requests that this Court:

A. Assume jurisdiction over this matter;

B. Enter judgment in favor of Plaintiff and against Defendant on all Counts;

C. Award Plaintiff compensatory damages in an amount to be determined at trial, including but not limited to:

- Lost profits and fee income exceeding the jurisdictional amount of $25,000.00;
- Increased operational costs including staffing, litigation expenses, filing fees, and expert witness fees;
- Business interruption damages;

D. Award Plaintiff exemplary and punitive damages in an amount sufficient to punish Defendant's willful, malicious, and discriminatory conduct and to deter similar conduct in the future;

E. Award Plaintiff costs, expenses, and reasonable attorney fees as provided by statute;

F. Award Plaintiff pre-judgment and post-judgment interest as provided by law;

G. Enter declaratory judgment that Defendant's claims-handling practices violate Michigan and federal civil rights laws;

H. Enter permanent injunctive relief:

- Ordering Defendant to cease all discriminatory claims-handling practices;
- Requiring Defendant to implement non-discriminatory claims-handling protocols subject to court oversight;
- Requiring Defendant to provide training to all claims personnel on civil rights compliance;
- Requiring Defendant to submit to periodic auditing of claims-handling practices;

I. Grant such other and further relief as this Court deems just and equitable.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

***/s/ Robert Akouri***

**AKOURI & ASSOCIATES, PLLC**
By: Robert Akouri (P-43788)
18306 Middlebelt Rd.
Livonia, MI 48152
(313) 584-1404
akouripllc@yahoo.com